STATE of Wisconsin,
Plaintiff-Respondent,

v.

Joseph C. MILLER,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2010AP557–CR. Oral argument April 24, 2012.
—Decided June 12, 2012.*

2012 WI 61

(Also reported in 815 N.W.2d 349.)

For the defendant-appellant-petitioner, there were briefs and oral argument by *Martha K. Askins,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *David H. Perlman*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

¶ 1. N. PATRICK CROOKS, J. This is a review of a summary disposition of the court of appeals[1] affirming the decision of the Marinette County Circuit Court, the Honorable Tim A. Duket presiding. The circuit court denied a motion by Joseph C. Miller (Miller)[2] to suppress evidence and his statement that police obtained after an investigatory stop. The sole issue on review is whether information provided to police from several informants along with police corroboration provided the requisite reasonable suspicion for an investigatory stop of Miller in the car he was driving.

¶ 2. Officers in the Marinette County Sheriff's Department stopped a black Ford Explorer that Miller was driving on suspicion that Miller was engaged in a drug-related crime. Leading up to the stop, the police had received information from several informants indicating that Miller was involved in selling drugs.

¶ 3. Initially, police were unable to corroborate information from two sources of limited reliability, an inmate awaiting revocation of his supervision and anonymous tips from Crime Stoppers. Police later received information from an informant who wished to

---

[1] *State v. Miller*, No. 2010AP557–CR, unpublished order (Wis. Ct. App. June 29, 2011).

[2] While briefing was underway, counsel sent a letter advising this court that Miller had passed away. Neither party moved to dismiss this case as moot following Miller's death, and both parties briefed and argued the issues before us. We decide the novel issues presented in this case consistent with this court's role to develop and clarify the law. Wis. Stat. § (Rule) 809.62(1r) (2009–10).

remain anonymous but provided his cellphone number and first name to Deputy Rick Berlin (Deputy Berlin), a Marinette County Sheriff's Deputy on the Northeast Tri-County Drug Task Force. The informant also risked disclosing his identity to police by contacting Deputy Berlin through one of Deputy Berlin's confidential informants. The information provided by this final informant, including police corroboration of some details and future predictions in the tips, along with information from the prior tips, led police to conduct an investigatory stop of the black Ford Explorer that Miller was driving on August 20, 2008. As a result of the investigatory stop and search, police discovered marijuana, cocaine, a digital scale and cash. Miller also admitted using heroin that morning.

¶ 4. The circuit court denied Miller's motion to suppress the evidence and statement obtained from this stop, and Miller pleaded no contest to possession of between five and 15 grams of cocaine with intent to distribute as a party to a crime contrary to Wis. Stat. § 961.41(1m)(cm)2. and § 939.05 (2007–08).[3] Miller appealed, and the court of appeals affirmed.[4]

¶ 5. We conclude that under the totality of the circumstances police acted reasonably when they conducted an investigatory stop of the vehicle that Miller was driving based on reasonable suspicion "that criminal activity may be afoot."[5] We are confident that police had the requisite reasonable suspicion primarily based on the reliability of the final informant and the information provided by him. Such information was sup-

---

[3] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

[4] *Miller*, No. 2010AP557–CR.

[5] *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

ported by the prior tips to police. We note that while the initial tips were of limited reliability, the final informant and his tips had significant indicia of reliability because the informant provided self-identifying information that made him more reliable than a truly anonymous informant.[6] Additionally, the final informant provided details and accurate future predictions that police were able to corroborate.[7] We hold that the officers acted reasonably under the circumstances in stopping Miller based on the objective test set forth in *Terry v. Ohio*, which asks: "[W]ould the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"[8] We conclude that the answer to that question is yes.

¶ 6. Therefore, we affirm the court of appeals.

## I

¶ 7. In the months leading up to the investigatory stop at issue here, Deputy Berlin received information from several sources that Miller was trafficking drugs in Marinette County.

¶ 8. The first source was Nathan Manicor (Manicor), who was being held in the Marinette County jail awaiting the revocation of his parole when he asked to speak with Deputy Berlin on November 19, 2007. Manicor told Deputy Berlin that Miller was selling drugs—including "ready rock cocaine," which is crack

---

[6] *State v. Williams*, 2001 WI 21, ¶¶ 28–36, 241 Wis. 2d 631, 623 N.W.2d 106; *State v. Rutzinski*, 2001 WI 22, ¶ 21, 241 Wis. 2d 729, 623 N.W.2d 516.

[7] *Alabama v. White*, 496 U.S. 325, 332 (1990).

[8] *Terry*, 392 U.S. at 21–22 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).

cocaine and marijuana, and acid-laced Spree candies that Miller was storing in a pizza box—from Miller's residence at an address on Water Street. Further, Manicor indicated that someone from Milwaukee was delivering the drugs to Miller in Marinette and that Miller was paying $950 per ounce of cocaine. Manicor reported that Miller owned a blue and silver Chevy S-10 pickup truck at that time. Manicor indicated that he had personal knowledge of these facts because he had been selling drugs with Miller before he was detained for the revocation of his parole.

¶ 9. The second source of information came from three tips to the Marinette County Crime Stoppers Program.[9] On June 16, 2008, a tipster reported that Miller was living in lot number 12 of a trailer park located behind a Domino's Pizza and was selling cocaine that he picked up from Chicago. The report also indicated that Miller drove a teal four-door vehicle. On July 8, 2008, another tip indicated that Miller lived at 334 Terrace Avenue in the City of Marinette, drove a green extended cab pickup truck and was selling pain killers, cocaine, heroin, and marijuana. On July 24, 2008, a third tip reported that Miller planned to sell an ounce of cocaine and 300 methadone tablets. Deputy Berlin testified at the suppression hearing that he believed all of these tips came from the same person because, in the later tips, the caller expressed irritation that police had not done anything in response to the earlier tips.

---

[9] Deputy Berlin explained that Crime Stoppers is a "program . . . where people can call in anonymously, report criminal activity, [are] assigned a code number and if that information leads to an arrest or criminal complaint and summons issued against the suspect or suspects, that tipster is offered a cash reward."

¶ 10. After Deputy Berlin got these tips and before the final tips that led to Miller's stop and arrest, Deputy Berlin conducted some follow-up investigation. Deputy Berlin watched Miller's residences but was unable to either corroborate or disprove the allegations that Miller was dealing drugs. Deputy Berlin did discover that, in 2001, Miller was convicted of possession of drug paraphernalia contrary to Wis. Stat. § 961.573(1) (1999–2000).

¶ 11. The third source of information was an informant who provided information to Deputy Berlin on the condition that he remain anonymous. The first of several contacts with this informant occurred on August 19, 2008, around 9:00 p.m. A confidential informant that Deputy Berlin had worked with previously contacted Deputy Berlin on his work cellphone. The confidential informant told Deputy Berlin that someone wanted to talk with him and then handed the phone to the informant who gave the final tips that police relied on in this case. The informant told Deputy Berlin that he wanted to remain anonymous, but gave Deputy Berlin his first name. Deputy Berlin could not remember the name when he testified.

¶ 12. In the first call to Deputy Berlin the informant stated that either Miller or Ryan Kowalski (Kowalski) or both were planning to drive Kowalski's black Ford Explorer, license plate number 712 NNE, to Milwaukee to buy drugs. The informant offered that Miller lived on the corner of Fourth Street and Terrace Avenue in the City of Marinette and that Kowalski lived on Kowalski Road. The informant stated that the men would leave with between $5,000 and $10,000 to buy 200–300 packs of heroin, 200 packs of cocaine and Oxycontin tablets. Further, the informant indicated that they would be back in the Marinette area before

315

2:00 or 3:00 p.m. the next day, August 20. Deputy Berlin testified that the informant did not say, and Deputy Berlin did not know, how the informant obtained this information.

¶ 13. Deputy Berlin verified that a black Ford Explorer, license plate number 712 NNE, was registered to Kowalski at N2401 Kowalski Road. At around 8:00 a.m. the following morning, on August 20, 2008, Deputy Berlin drove past Kowalski's residence and saw that Kowalski's black Ford Explorer was parked in the driveway.

¶ 14. That same morning on August 20, Deputy Berlin called the informant back on the informant's cellphone,[10] as he had the cellphone number saved in his cellphone. Deputy Berlin told the informant that he did not think Miller and Kowalski went to Milwaukee because Kowalski's vehicle was still parked in his driveway. The informant agreed with the deputy's inference because the informant had also seen the black Ford Explorer parked in Kowalski's driveway that morning. The informant told Deputy Berlin that he would call him back if he got any more information.

---

[10] Based on the testimony in the record, we conclude, as did the circuit court, that it was this final informant's cellphone number, not the confidential informant's number, that Deputy Berlin had saved in his phone. The record is somewhat unclear in regard to whose cellphone it was that Deputy Berlin called during the morning of August 20, 2008. We uphold the circuit court's finding of fact that this cellphone belonged to the informant who gave the final tips in this case because that finding is not clearly erroneous. *Williams*, 241 Wis. 2d 631, ¶ 18. The circuit court's finding is consistent with the most reasonable conclusion from the record, which includes the fact that the deputy was able to reach the final informant directly when he called him back.

¶ 15. In a third call, the informant called Deputy Berlin at 4:34 p.m. that same day, August 20, to report that Miller had left for Milwaukee at around 2:00 p.m., by himself, to pick up drugs. The informant stated that Miller was driving Kowalski's black Ford Explorer and would be back in the Marinette area no later than 11:00 p.m. that same day.

¶ 16. Deputy Berlin immediately followed up on that tip by driving past Miller's and Kowalski's residences. Kowalski's black Ford Explorer was not there. Deputy Berlin and other officers took a position along Highway 41 to watch for Kowalski's vehicle to come back into Marinette County before 11:00 p.m. At 10:30 p.m., about a thirty minute drive outside of the City of Marinette, the officers saw a black Ford Explorer with registration tags matching those of Kowalski driving on Highway 41 toward Marinette County. The officers, including Deputy Berlin, followed Kowalski's black Ford Explorer, and after it crossed into Marinette County, a marked squad car stopped the vehicle.

¶ 17. Miller was driving the vehicle, and the officers arrested him and a passenger, James Orzel (Orzel). The officers discovered cocaine, marijuana, a digital scale and cash in a search of Miller, Orzel and the vehicle. Miller was ill and had vomited on himself at some point before the police stopped him. Deputy Berlin testified that he was concerned that Miller might have overdosed, and for that reason he had asked Miller whether he had used any drugs. Miller responded that he had used heroin that morning.

II

¶ 18. The State charged Miller with possession of cocaine with intent to distribute contrary to Wis. Stat.

317

§ 961.41(1m)(cm)2.,[11] and possession of marijuana with intent to distribute contrary to Wis. Stat. § 961.41(1m)(h)1.[12] as party to a crime contrary to Wis.

[11] Wisconsin Stat. § 961.41(1m)(cm)2. provides in relevant part:

> (1m) Possession with intent to manufacture, distribute or deliver. Except as authorized by this chapter, it is unlawful for any person to possess, with intent to manufacture, distribute or deliver, a controlled substance or a controlled substance analog. Intent under this subsection may be demonstrated by, without limitation because of enumeration, evidence of the quantity and monetary value of the substances possessed, the possession of manufacturing implements or paraphernalia, and the activities or statements of the person in possession of the controlled substance or a controlled substance analog prior to and after the alleged violation. Any person who violates this subsection is subject to the following penalties:
>
> . . .
>
> (cm) Cocaine and cocaine base. If a person violates this subsection with respect to cocaine or cocaine base, or a controlled substance analog of cocaine or cocaine base, and the amount possessed, with intent to manufacture, distribute or deliver, is:
>
> . . .
>
> 2. More than 5 grams but not more than 15 grams, the person is guilty of a Class E felony.

[12] Wisconsin Stat. § 961.41(1m)(h)1. provides in relevant part:

> (1m) Possession with intent to manufacture, distribute or deliver. Except as authorized by this chapter, it is unlawful for any person to possess, with intent to manufacture, distribute or deliver, a controlled substance or a controlled substance analog. Intent under this subsection may be demonstrated by, without limitation because of enumeration, evidence of the quantity and monetary value of the substances possessed, the possession of manufacturing implements or paraphernalia, and the activities or statements of the person in possession of the controlled substance or a controlled substance analog prior to and after the alleged violation. Any person who violates this subsection is subject to the following penalties:
>
> . . .

Stat. § 939.05.[13] Miller moved to suppress the evidence and his statement on the basis that, according to Miller, police lacked reasonable suspicion for the investigatory stop.[14]

(h) Tetrahydrocannabinols. If a person violates this subsection with respect to tetrahydrocannabinols, included under s. 961.14(4)(t), or a controlled substance analog of tetrahydrocannabinols, and the amount possessed, with intent to manufacture, distribute, or deliver, is:

1. Two hundred grams or less, or 4 or fewer plants containing tetrahydrocannabinols, the person is guilty of a Class I felony.

[13] Wisconsin Stat. § 939.05 provides:

(1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although the person did not directly commit it and although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act.

(2) A person is concerned in the commission of the crime if the person:

(a) Directly commits the crime; or

(b) Intentionally aids and abets the commission of it; or

(c) Is a party to a conspiracy with another to commit it or advises, hires, counsels or otherwise procures another to commit it. Such a party is also concerned in the commission of any other crime which is committed in pursuance of the intended crime and which under the circumstances is a natural and probable consequence of the intended crime. This paragraph does not apply to a person who voluntarily changes his or her mind and no longer desires that the crime be committed and notifies the other parties concerned of his or her withdrawal within a reasonable time before the commission of the crime so as to allow the others also to withdraw.

[14] Before the circuit court, Miller challenged the legality of the investigatory stop, the frisk and his arrest. Before this court, Miller challenges only the investigatory stop. Therefore, we address only that part of the circuit court's decision relevant to the propriety of the investigatory stop.

319

¶ 19. The Marinette County Circuit Court denied Miller's motion to suppress. Significantly, the circuit court found that the final informant was not truly an anonymous source because he had provided Berlin with his first name and cellphone number. The circuit court found this informant more credible and reliable because he provided self-identifying information that exposed him to prosecution for obstructing an investigation if he provided false information.[15] The circuit court emphasized the details in the final informant's tips that turned out to be true: the black Ford Explorer, license plate number 712 NNE, was registered to Kowalski at N2401 Kowalski Road and, on August 20, 2008, was heading towards the City of Marinette on the most direct route from Milwaukee, on schedule to arrive in the City of Marinette around 11:00 p.m. The circuit court also found that the source of the informant's information was not evident from the testimony. On that basis, the circuit court rejected Miller's argument that the tips were based on hearsay.

¶ 20. The circuit court noted that the prior tips, while of limited reliability standing alone, added to the officers' suspicion that Miller was involved in illegal drug activity. The tips from Manicor and Crime Stoppers were not, by themselves, inherently reliable, and police were not able to corroborate the information in the tips, but the circuit court stated that it was reasonable for police to take these tips into account when weighing the information provided by the final informant. Further, the circuit court noted that Deputy Berlin had discovered, prior to getting the final tips,

---

[15] *See* Wis. Stat. § 946.41 (providing criminal penalties for anyone who knowingly provides false information to an officer who is acting in an official capacity).

320

that Miller had a prior conviction for possession of drug paraphernalia. Under the totality of these circumstances, the circuit court concluded that officers acted reasonably with the requisite reasonable suspicion to conduct an investigatory stop of Miller when he was driving Kowalski's black Ford Explorer on August 20, 2008.

¶ 21. Miller pleaded no contest to possession of between five and 15 grams of cocaine with intent to distribute as party to a crime contrary to Wis. Stat. § 961.41(1m)(cm)2. and § 939.05. The circuit court sentenced Miller to four years of initial confinement and three years on extended supervision. Miller appealed the circuit court's denial of his motion to suppress.[16]

¶ 22. The court of appeals affirmed the circuit court's denial of Miller's motion to suppress and judgment of conviction. *State v. Miller*, No. 2010AP557–CR, unpublished order (Wis. Ct. App. June 29, 2011). In a summary disposition, the court of appeals concluded that, while the tips by Manicor and Crime Stoppers were of limited reliability, the information provided by the final informant was more credible and reliable, and police had reasonable suspicion for the investigatory stop considering the totality of the circumstances. *Id.* at 5.

¶ 23. The court of appeals stated that the information from Manicor was of limited reliability "due to the inmate's questionable motivations, the time which had passed, and the fact that the information could not be contemporaneously corroborated." *Id.* Further, the court of appeals concluded that the Crime Stoppers tips were also of limited reliability "because the source was

---

[16] Wisconsin Stat. § 971.31(10) allows the appeal and review of the circuit court's denial of a motion to suppress notwithstanding the defendant's subsequent plea of no contest.

anonymous, the tipster provided little detail, and the police were unable to verify it." *Id.* The court of appeals noted that, while not corroborated, this information also had not been proven to be false. *Id.*

¶ 24. The court of appeals concluded that the information from the final informant was more credible and reliable because the informant called from "a traceable cell phone and provided considerably more verifiable details." *Id.* The court of appeals noted that police were able to corroborate many of these details. *Id.* The court of appeals concluded that despite the limited reliability of the prior tips standing alone, "the police were certainly entitled to consider the fact that they had received multiple reports of Miller's involvement in drug dealing when assessing the final, most detailed tip about ongoing activity." *Id.* Therefore, the court of appeals concluded that police had reasonable suspicion to conduct an investigatory stop under the totality of the circumstances.

¶ 25. Miller petitioned this court for review, and we granted his petition.

III

¶ 26. This case presents a single issue on review: whether information provided to police from several informants along with police corroboration provided the requisite reasonable suspicion for an investigatory stop of Miller in the car he was driving. This issue presents a question of constitutional fact, which this court reviews under a two-step analysis. *State v. Williams*, 2001 WI 21, ¶ 18, 241 Wis. 2d 631, 623 N.W.2d 106. First, this court examines the circuit court's findings of fact. We will uphold the circuit court's findings of fact unless they are

clearly erroneous. *Id.* Second, this court reviews de novo whether the facts meet the constitutional standard of reasonable suspicion. *Id.*

## IV

¶ 27. We begin by examining the applicable legal standards to determine whether police had the reasonable suspicion required to conduct an investigatory stop of the vehicle that Miller was driving. We then turn to examine the officers' actions in this case under these standards.

## A

¶ 28. The Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution provide citizens with the guarantee to be free from "unreasonable searches and seizures." *State v. Richardson*, 156 Wis. 2d 128, 137, 456 N.W.2d 830 (1990) (internal quotations omitted). We generally interpret Article I, Section 11 consistent with the United States Supreme Court's interpretation of the parallel Fourth Amendment, and therefore rely on United States Supreme Court precedent in applying and interpreting Article I, Section 11 as well as the Fourth Amendment. *State v. Felix*, 2012 WI 36, ¶ 38, 339 Wis. 2d 670, 811 N.W.2d 775.

¶ 29. In *Terry v. Ohio*, 392 U.S. 1, 8, 30 (1968), the United States Supreme Court explained that it is reasonable and consistent with Fourth Amendment protections for an officer to conduct a temporary, "investigatory 'stop' " of an individual if the officer has reasonable

suspicion "that criminal activity may be afoot." "[I]n justifying the particular intrusion[—the investigatory stop—]the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. The test is an objective one: "[W]ould the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21–22 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)).

¶ 30. The *Terry* investigatory-stop test has been adopted by this court, *State v. Waldner*, 206 Wis. 2d 51, 55, 556 N.W.2d 681 (1996), and codified by the Wisconsin legislature in Wis. Stat. § 968.24,[17] *Williams*, 241 Wis. 2d 631, ¶ 21. We consider the totality of the circumstances leading up to the investigatory stop and focus our analysis on "the reasonableness of the officers' actions in the situation facing them." *Williams*, 241 Wis. 2d 631, ¶¶ 22–23.

¶ 31. When police have relied, at least in part, on information from an informant, we balance two factors to determine whether officers acted reasonably in reli-

---

[17] Wisconsin Stat. § 968.24 provides:

Temporary questioning without arrest. After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

ance on that information. *Id.*, ¶ 22. The first is the quality of the information, which depends upon the reliability of the source.[18] *Id.* The second is the quantity or content of the information. *Id.* There is an inversely proportional relationship between the quality and the quantity of information required to reach the threshold of reasonable suspicion. *Id.*

■

¶ 32. In other words, if an informant is more reliable, there does not need to be as much detail in the tip or police corroboration in order for police to rely on that information to conduct an investigatory stop.[19] On the other hand, if an informant has limited reliability—

[18] There are several types of informants, including a citizen informant—"someone who happens upon a crime or suspicious activity and reports it to police"—who is generally considered among the most reliable informants, *State v. Kolk*, 2006 WI App 261, ¶ 12, 298 Wis. 2d 99, 726 N.W.2d 337; a confidential informant—someone, "often with a criminal past him- or herself, who assists the police in identifying and catching criminals" —who may be more reliable if he or she has provided truthful information to police in the past, *id.*; and an anonymous informant—someone "whose identity is unknown even to the police"—who is considered reliable if police are able to corroborate details in the informant's tip, *id.*

[19] *See, e.g., Williams*, 241 Wis. 2d 631 (upholding an investigatory stop based on a tip from a reliable informant and some police corroboration of innocent details in the tip); *Rutzinski*, 241 Wis. 2d 729 (upholding an investigatory stop based on a tip from a reliable informant who was traceable by police even though there was little police corroboration of the informant's allegations prior to the stop); *Adams v. Williams*, 407 U.S. 143 (1972) (upholding an investigatory stop based on information provided by a more reliable informant known to the investigating officer even though there was little corroboration of or specific information provided in the tip).

for example, an entirely anonymous informant—the tip must contain more significant details or future predictions along with police corroboration.[20] The relevant question is whether the tip contained "sufficient indicia of reliability," along with other information known to police, to support reasonable suspicion for an investigatory stop. *Alabama v. White*, 496 U.S. 325, 332 (1990).

¶ 33. The law recognizes that the reliability of informants varies greatly. *Rutzinski*, 241 Wis. 2d 729, ¶ 17. There is variation even within the realm of informants who wish to remain anonymous depending upon whether the informant risked disclosing his or her identity to police. Information from an entirely anonymous informant, without more, is not considered very reliable because the "tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Florida v. J.L.*, 529 U.S. 266, 270 (2000). In contrast, an informant who provides some self-identifying information is likely more reliable than an anonymous informant because "[r]isking one's identification intimates that, more likely than not, the informant is a genuinely concerned citizen as opposed to a fallacious prankster." *Williams*, 241 Wis. 2d 631, ¶ 35. This is so because an informant who discloses his or her identity to police could potentially " 'be held responsible if [his or] her allegations

[20] *State v. Richardson*, 156 Wis. 2d 128, 456 N.W.2d 830 (1990) (upholding an investigatory stop based on an anonymous tip of limited independent reliability because the tip included significant details and future predictions verified by police); *Alabama v. White*, 496 U.S. 325 (1990) (same); *State v. Sherry*, 2004 WI App 207, 277 Wis. 2d 194, 690 N.W.2d 435 (same); *Florida v. J.L.*, 529 U.S. 266 (2000) (concluding that police lacked reasonable suspicion for an investigatory stop based on an anonymous tip that lacked detail and police corroboration).

turned out to [have been] fabricated.' " *Id.*, ¶ 38 (alterations in original) (quoting *J.L.*, 529 U.S. at 270); *see also* Wis. Stat. § 946.41.

■

¶ 34. The key to this analysis is the informant's knowledge or presumed knowledge that a consequence of disclosing his or her identity is accountability for providing a false tip. Stated differently, police may infer that an informant who risks disclosing his or her identity is more likely to be providing truthful information because the informant knows that police can hold him or her accountable for providing false information.[21]

¶ 35. As we turn to examine how these principles have been applied to the facts presented in past cases, we keep in mind that each case that examines whether police had reasonable suspicion based on the totality of the circumstances is naturally highly fact specific and must "be decided on its own facts." *Terry*, 392 U.S. at 30.

B

¶ 36. Cases examining reasonable suspicion for an investigatory stop are fact intensive, and even in the category of cases involving information from a purport-

---

[21] *See Rutzinski*, 241 Wis. 2d 729, ¶ 32 (The officer "thus could infer that by revealing that he or she was in a particular vehicle, the informant understood that the police could discover his or her identity by tracing the vehicle's license plates or directing the vehicle to the side of the road[,] . . . [and the officer] could reasonably have concluded that the informant knew that he or she potentially could be arrested if the tip proved to be fabricated."); 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.5(h), at 598 (4th ed. 2004).

edly anonymous informant, each case strikes a different balance between the quality and quantity of information required. We plot out a few established points along this spectrum to guide our analysis of whether the quality and quantity of information in this case adds up to reasonable suspicion.

¶ 37. Where an investigatory stop is based on an entirely anonymous tip, it is critical that the informant provide significant, specific details and future predictions that police are able to corroborate. In *White*, 496 U.S. 325, the details and future predictions lent sufficient credibility to the anonymous tip. Police received an anonymous call that White would be leaving her apartment carrying a brown attaché case with an ounce of cocaine and driving to a particular motel at a certain time in a brown Plymouth station wagon that had a broken right taillight. *Id.* at 327. Officers conducted surveillance and observed White leave her apartment and get into her car, carrying nothing. *Id.* Officers followed as White drove along the most direct route to the motel. *Id.* Police stopped the car before she got to the destination, searched her car and discovered marijuana in a brown attaché case. *Id.* The United States Supreme Court concluded that "the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion that [White] was engaged in criminal activity." *Id.* at 331. The Court emphasized that " 'the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted.' " *Id.* at 332 (alteration in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 245 (1983)). The Court noted that *White* was a close case,

suggesting that the quantity of details provided by the informant may be at the lower end of the permissible range. *Id.*

¶ 38. In *Richardson*, 156 Wis. 2d 128, this court concluded that there was reasonable suspicion for an investigatory stop based on an entirely anonymous tip because the tip contained significant details and future predictions that were corroborated by police. In *Richardson*, an anonymous caller provided police with substantial and significant details and future predictions, specifically: Richardson "and another specifically identified man were en route from Viroqua to La Crosse with about one-quarter ounce of cocaine which they intended to sell in La Crosse"; the men left Viroqua and were expected to arrive in La Crosse at particular times; Richardson was the passenger in the car; the men were travelling on Highways 14 and 35, would travel through Westby and Coon Valley, and planned to stop at a residence in La Crosse; the men were driving a 1978 Camaro; Richardson was a large man, weighing around 300 pounds and standing about six feet tall, had scarring on his face and was missing parts of his fingers; and Richardson had previous drug-related offenses. *Id.* at 133–34. The anonymous informant also provided the license plate number of the vehicle and stated that he had been with Richardson and the other man and had seen the cocaine. *Id.*

¶ 39. The officer had no knowledge of Richardson or any planned drug sales before speaking with the anonymous caller. *Id.* at 134. Based solely on the information in this tip, the officer set up surveillance on Highway 14 near the intersection with Highway 35 along with another officer. *Id.* at 134–35. When the Camaro passed the surveillance point, the officers followed the car and observed that it stopped at an

apartment building in La Crosse. *Id.* at 135. Police stopped the vehicle after the men returned. *Id.* This court held that police had "reasonable articulable suspicion for an investigatory stop" based on the officers' corroboration of a significant number of the innocent details and future predictions provided in the tip, even more so than the details present in *White*. *Id.* at 138, 142–43.

¶ 40. In *State v. Sherry*, 2004 WI App 207, 277 Wis. 2d 194, 690 N.W.2d 435, the court of appeals concluded that police had reasonable suspicion to conduct an investigatory stop based on an anonymous Crime Stoppers tip. The anonymous tip indicated that, presently or in the near future, Sherry would be travelling from the Readstown area to the Soldiers Grove area with a large amount of marijuana. *Id.*, ¶ 11. The caller provided the make, color and license plate number of the car and stated that it belonged to Sherry. *Id.* The caller indicated that another person, Ryan Saint, "might be in the car and, if he was, he would be driving." *Id.* Police set up surveillance along the likely route and, about an hour after receiving the tip, the vehicle described passed along the route to Soldiers Grove. *Id.*, ¶ 12. An officer followed and verified that the make and license plate of the vehicle matched the one described in the tip. The officer observed that the driver was likely male. *Id.*

¶ 41. The court of appeals concluded that the anonymous tip was sufficiently reliable to support reasonable suspicion because it included significant details and detailed future predictions. *Id.*, ¶¶ 13–14. The court noted that the differences between the facts in *Sherry* and *White* were "a wash"—while there was more corroboration in *White*, there was an additional future

330

prediction in *Sherry*, i.e., that another person might be in the car and, if so, he would be driving. *Id.*, ¶ 14.

¶ 42. The United States Supreme Court, in *J.L.*, 529 U.S. 266, delineated some limits on using an anonymous tip that is accompanied by minimal police corroboration as the sole basis for reasonable suspicion for an investigatory stop, where the tip lacked detail and future predictions. In *J.L.*, police received an anonymous tip that a young black male, wearing a plaid shirt and standing at a particular bus stop, was carrying a firearm. *Id.* at 268. Police went to that bus stop and observed three black males standing at the bus stop, one of whom was wearing a plaid shirt. *Id.* Without obtaining any additional information the officers conducted an investigatory stop and frisk, and discovered that J.L., the young black male at the bus stop who was wearing a plaid shirt, was carrying a gun. *Id.* The United States Supreme Court concluded that this barebones anonymous tip, with no predictive information or other means to test the anonymous informant's knowledge or credibility, lacked the indicia of reliability required to provide police with reasonable suspicion. *Id.* at 271. In terms of the balance between the quality and quantity of information, the low-quality anonymous tip in *J.L.*, with minimal police corroboration, lacked the quantity of detailed information and future predictions required to reach the level of reasonable suspicion.

¶ 43. Where an investigatory stop is based on a higher-quality tip from an informant who has provided some self-identifying information, police often rely on information in that tip where police can corroborate some of the details provided, even if the tip lacks the quantity of details and future predictions required for a truly anonymous tip. For example, in *Williams*, 241 Wis. 2d 631, ¶ 34, this court examined *J.L.* and distin-

guished that case in part on the basis that the informant in *Williams* was not truly anonymous. In *Williams*, the tip came from a 911 caller who wanted to remain anonymous. *Id.*, ¶ 4. The informant reported that someone was dealing drugs from a vehicle behind the caller's apartment and that the vehicle was there as that person was on the phone. *Id.* When asked to provide a description of the vehicle, the caller put down the phone, presumably to take another look outside, before describing the vehicle as a blue and burgundy Bronco. *Id.* The caller provided the address of the apartment and indicated that the vehicle was in the driveway next to the apartment. *Id.*

¶ 44. This information was dispatched to officers who arrived at the address provided by the informant shortly thereafter. *Id.*, ¶¶ 5–6. The officers saw a vehicle matching the description provided by the informant parked in a driveway alongside an empty lot behind the building. *Id.*, ¶ 6. They also observed that the vehicle had no license plates and that the male in the driver's seat, Williams, reached down and behind the passenger's seat when the officers pulled into view. *Id.*, ¶¶ 7–8. Officers drew their weapons, conducted an investigatory stop and found substances that were likely marijuana and cocaine base in the area where Williams had been reaching. *Id.*, ¶¶ 8–10.

¶ 45. This court held that, under the totality of the circumstances, police had reasonable suspicion for the stop. This court distinguished *J.L.* in a number of respects. First, in *Williams*, the informant explained how she knew the information: she was observing it. *Id.*, ¶ 33. Second, it was significant that the informant was not entirely anonymous in *Williams*—in fact the circuit court found that she was a citizen informant because she provided the address to the apartment that

she described as her home. *Id.*, ¶¶ 34–36. Third, the police were able to corroborate innocent, but significant, details of the tip including the location and description of the vehicle. *Id.*, ¶ 39. Fourth, police noticed two additional suspicious facts when they responded to the tip: (1) the vehicle had no license plates, and (2) Williams reached down and behind the passenger's seat when the officers pulled into view, suggesting that he may have been trying to reach for a weapon or conceal evidence. *Id.*, ¶¶ 43, 45.

¶ 46. In *Rutzinski*, 241 Wis. 2d 729, this court also concluded that police had reasonable suspicion for an investigatory stop based on a tip that contained limited details from an informant who risked disclosing her identity. The informant in *Rutzinski*, an unidentified motorist, called police to report that a black pickup truck driving behind him or her was weaving in its lane, varying its speed dramatically and following too closely behind his or her vehicle. *Id.*, ¶ 4. After receiving this report, an officer on patrol, Officer Sardina, pulled behind the black pickup truck and the informant, who was still on the phone with police and directly in front of the black pickup truck, said that the officer was following the right vehicle. *Id.*, ¶ 6. The officer did not observe any erratic driving but stopped the black pickup truck on suspicion of drunken driving based on the tip. *Id.*, ¶ 7.

¶ 47. This court concluded that police had reasonable suspicion for the investigatory stop, primarily based on the reliability of the information provided by the informant. *Id.*, ¶¶ 31–34. The informant and the tip were more reliable because the informant had exposed his or her identity to police and could have been held accountable for providing false information:

Officer Sardina thus could infer that by revealing that he or she was in a particular vehicle, the informant understood that the police could discover his or her identity by tracing the vehicle's license plates or directing the vehicle to the side of the road. That is, like the officer in *Adams*, Officer Sardina *could reasonably have concluded that the informant knew that he or she potentially could be arrested if the tip proved to be fabricated.*

*Id.*, ¶ 32 (emphasis added) (footnote omitted). We also indicated that the information from the informant was reliable because "he or she was making personal observations of Rutzinski's contemporaneous actions." *Id.*, ¶ 33. Finally, we indicated that the officer's actions in conducting an investigatory stop were particularly reasonable given the imminent risk to public safety presented by an alleged drunk driver presently on the road. *Id.*, ¶ 34.

C

¶ 48. We now apply the standard for reasonable suspicion to the facts in this case, guided by the framework set out above. As an initial matter we conclude, as both parties agree, that the officers' actions in conducting an investigatory stop of the black Ford Explorer that Miller was driving is a seizure for the purposes of the Fourth Amendment and Article I, Section 11. *Rutzinski*, 241 Wis. 2d 729, ¶ 14. The parties' dispute is focused on whether police had the requisite reasonable suspicion for the investigatory stop.

¶ 49. Miller argues that police lacked reasonable suspicion in this case because there were insufficient specific and articulable facts to support a reasonable belief that Miller was engaged in a crime when the

vehicle he was driving was stopped. Miller asserts that the tips from Manicor and Crime Stoppers cannot provide a basis for reasonable suspicion because those tips are unreliable and uncorroborated. Miller further argues that information from the final informant does not provide police with reasonable suspicion for several reasons. First, according to Miller, anonymous or confidential informants start off with low reliability. Second, Miller argues that the tipster was wrong in a number of important respects, most significantly by first telling Deputy Berlin that Miller would leave with Kowalski on August 19 to pick up drugs in Milwaukee. Third, Miller asserts that the police conducted only minimal investigation and corroborated only innocent details from the tips, which included information that would be obvious to anyone familiar with Miller. Fourth, Miller argues that the informant reported only hearsay information, which further undermines his reliability.[22] Miller argues that several unreliable and uncorroborated tips cannot add up to reasonable suspicion.

---

[22] Deputy Berlin testified that, as his report reflected, the informant told him in the first call that someone had told the informant that Miller and Kowalski were going to Milwaukee to buy drugs on August 19, 2008. Miller argued on this basis that the information was unreliable hearsay. The circuit court found that the record did not support Miller's argument that the final informant provided only hearsay information because that argument was based solely on the informant's statement that he was told the information he provided in the first call to Deputy Berlin. We agree and uphold the circuit court's finding because it is not clearly erroneous. *Williams*, 241 Wis. 2d 631, ¶ 18. The fact that the record is somewhat unclear about the source of the informant's information is not enough to support Miller's argument premised on the fact that the tips were, in fact, hearsay, particularly given the circuit court's finding to the contrary.

¶ 50. The State responds that the police had reasonable suspicion based on the totality of the circumstances. The State asserts that the officers acted reasonably pursuant to the standard articulated by this court in *Williams* and *Richardson*, based on all of the information they had from multiple tips and through police corroboration. According to the State, the information provided to and obtained by police in this case is very similar to information that the United States Supreme Court concluded was sufficient in *White* and that the court of appeals found sufficient in *Sherry*. In some respects, according to the State, the information is even stronger here than in *White* because, in this case, the tipster was not entirely anonymous, which makes his information more reliable, and the police had previously received information linking Miller to illegal drug activity. The State asserts that the court of appeals properly affirmed Miller's judgment of conviction.

¶ 51. We conclude that under the totality of the circumstances, police had reasonable suspicion to conduct an investigatory stop of the black Ford Explorer that Miller was driving. Police acted on reasonable suspicion based on multiple tips that Miller was driving the vehicle and was involved in an ongoing drug-related crime. The key information that supports reasonable suspicion was that provided by the final informant and corroborated by police, including the make, model, license plate and registration of the vehicle, and an accurate prediction of where it could be found and when. It was also entirely reasonable for Deputy Berlin to rely on his knowledge that prior tips by Manicor and Crime Stoppers had also alleged that Miller was selling drugs.

¶ 52. The factor that weighs most heavily in our analysis is the fact that the tips by the final informant contained significant indicia of reliability, as was the case in *Williams* and *Rutzinski*, because here the informant was not truly anonymous. We note that whether an informant is anonymous for the purpose of analyzing the informant's reliability and credibility is not controlled by whether he or she wanted to remain anonymous. Instead, a purportedly anonymous informant is not anonymous in this analysis if he or she provides self-identifying information such that we may infer that the informant knew that he or she could be held accountable for providing false information. *Rutzinski*, 241 Wis. 2d 729, ¶ 32.

¶ 53. In this case, the informant told Deputy Berlin that he wanted to remain anonymous but nevertheless risked disclosing his identity to police. Most significantly, the informant provided his first name and cellphone number to Deputy Berlin. In fact, Deputy Berlin was able to call the informant back on his cellphone and reach him directly when Deputy Berlin had follow-up questions for the informant the morning of August 20, 2008. Further, the fact that this informant contacted Deputy Berlin initially through one of the deputy's confidential informants provides another avenue through which the final informant's identity could have been discovered. Based on the testimony and arguments at the suppression hearing, the circuit court explicitly determined that this informant was more reliable because he risked disclosing his identity to police. We agree with the circuit court's determination because it is supported by the record and our precedent. The facts here are similar to those in *Williams* and *Rutzinski*, where the informants did not disclose their identities outright but provided enough information

from which we could reasonably infer that the informants realized that they could be tracked down for providing false information.

¶ 54. As in *Rutzinski*, 241 Wis. 2d 729, ¶ 32, the police reasonably relied on the final informant's information as truthful because one can reasonably infer that this informant knew that by risking the disclosure of his identity he could be held accountable for providing false information.[23] Whether or not the informant realized the implications of his disclosure in the first call, it is reasonable to infer that after he was called back by Deputy Berlin the following day with follow-up questions, he must have realized that he was traceable and could be subject to criminal penalties for any false allegations. As we stated in *Williams*, "[r]isking one's identification intimates that, more likely than not, the informant is a genuinely concerned citizen as opposed to a fallacious prankster." 241 Wis. 2d 631, ¶ 35. Therefore, it was reasonable for police to rely more heavily on information from such a reliable source.

¶ 55. Further, the final informant in this case provided some details and future predictions that police were able to corroborate similar to the details that the informants provided in *White*, *Richardson* and *Sherry*.[24] Deputy Berlin verified that a black Ford

---

[23] Wisconsin Stat. § 946.41 provides criminal penalties for anyone who knowingly provides false information to an officer who is acting in an official capacity.

[24] Miller argues that this case is more akin to the quality and quantity of information known to police in *Kolk*, 298 Wis. 2d 99, in which the court of appeals looked at tips from a citizen informant. We do not find *Kolk*—a case that centered on the question of whether a frisk was justified—particularly helpful to resolve whether police had reasonable suspicion for the investigatory stop in this case, which is the sole issue before

Explorer, license plate number 712 NNE, was registered to Kowalski at N2401 Kowalski Road. Additionally, the informant accurately predicted that Miller[25] would be driving Kowalski's black Ford Explorer, license plate number 712 NNE, along the most likely route back to the City of Marinette from Milwaukee, Highway 41, en route to arrive in the Marinette area at about 11:00 p.m. on August 20, 2008. While the informant in this case did not provide as many unique details and future predictions as the informants in *White*, *Richardson* and *Sherry*, the informant in this case started off with more credibility by providing self-identifying information. The quantity of information in this case is counterbalanced by the reliability of the informant.

¶ 56. It is also notable that Deputy Berlin spoke directly with the informant multiple times and would have been able to take first-hand account of the informant's tone and delivery in evaluating the honesty and reliability of the tips. *Williams*, 241 Wis. 2d 631,

---

this court. We analyze whether police had reasonable suspicion to conduct a protective search for weapons during an investigatory stop under a different standard—"whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." *State v. Johnson*, 2007 WI 32, ¶ 21, 299 Wis. 2d 675, 729 N.W.2d 182 (alteration in original) (quoting *Terry*, 392 U.S. at 27).

[25] We note that the officers did not identify Miller as the driver of Kowalski's black Ford Explorer until after the officers stopped the vehicle, and we therefore do not rely on the fact that Miller was driving in our reasonable suspicion analysis. Instead, police had reasonable suspicion based on the other details provided by the final informant—the vehicle's make, model, license plate and registration, and the route and time—the fact that the informant was more reliable, because he provided self-identifying information, and the prior information to police.

¶ 37 (noting that the recorded 911 call allowed for later judicial review "of the tipster's veracity, not only based upon content, but also based upon its tone and delivery"). Additionally, the credibility of the informant's information is not fatally undermined because he was not able to make an absolute prediction of the future, i.e., because he initially told Deputy Berlin that Miller would leave the night of August 19, 2008. As the court of appeals noted, it is entirely reasonable to infer that the informant's initial tip was accurate, but plans changed and Miller decided to go on August 20 instead.

¶ 57. While the prior tips from Manicor and Crime Stoppers were of limited reliability standing alone, it was reasonable for Deputy Berlin to consider these prior allegations when evaluating the reliability of the final tips. We agree with the court of appeals that the tip from Manicor was of limited reliability for several reasons. First, Manicor's motivation was questionable, which makes him less reliable. Manicor was in jail for parole revocation and he may have hoped that giving a tip to law enforcement would improve his situation. Second, Manicor's tip was nine months old when Deputy Berlin got the final tips, so Manicor's tip is of limited usefulness for the purposes of justifying this stop. The three Crime Stoppers tips were also of limited reliability because they were entirely anonymous, and Deputy Berlin was unable to corroborate the information. Deputy Berlin did discover, after receiving these tips and before the tips from the final informant, that Miller had a prior conviction for possession of drug paraphernalia. Despite the limited reliability of these earlier tips, they weigh in favor of reasonable suspicion because, as the court of appeals noted, these tips, while not corroborated, were also not proved false and were generally consistent with the allegations in the final tips.

340

¶ 58. We note that the existence of prior, though uncorroborated, tips that are consistent with the information from a reliable informant is a factor present in this case that apparently was not present in any of the above cases upon which we have relied to conclude that police had reasonable suspicion here. This factor adds to the totality of the circumstances and strengthens our conclusion that the officers acted with reasonable suspicion in this case.

V

¶ 59. We conclude that under the totality of the circumstances police acted reasonably when they conducted an investigatory stop of the vehicle Miller was driving based on reasonable suspicion "that criminal activity may be afoot."[26] We are confident that police had the requisite reasonable suspicion primarily based on the reliability of the final informant and the information provided by him. Such information was supported by the prior tips to police. We note that while the initial tips were of limited reliability, the final informant and his tips had significant indicia of reliability because the informant provided self-identifying information that made him more reliable than a truly anonymous informant.[27] Additionally, the final informant provided details and accurate future predictions that police were able to corroborate.[28] We hold that the officers acted reasonably under the circumstances in stopping Miller based on the objective test set forth in *Terry v. Ohio*, which asks: "[W]ould the facts available

[26] *Terry*, 392 U.S. at 30.

[27] *Williams*, 241 Wis. 2d 631, ¶¶ 28–36; *Rutzinski*, 241 Wis. 2d 729, ¶ 21.

[28] *White*, 496 U.S. at 332.

341

to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?"[29] We conclude that the answer to that question is yes.

¶ 60. Therefore, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

[29] *Terry*, 392 U.S. at 21–22 (quoting *Carroll*, 267 U.S. at 162).