# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2017AP1104-CR |
| COMPLETE TITLE: | State of Wisconsin,<br>        Plaintiff-Respondent,<br>   v.<br>Roy S. Anderson,<br>        Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 384 Wis. 2d 414,921 N.W.2d 528
(2018 – unpublished)

| | |
|---|---|
| OPINION FILED: | November 15, 2019 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 4, 2019 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Racine |
|   JUDGE: | Michael J. Piontek |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | HAGEDORN, J. concurs, joined by ZIEGLER, J. (opinion filed) |
|   DISSENTED: | |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Jay R. Pucek*, assistant state public defender. There was an oral argument by *Jay R. Pucek*

For the plaintiff-respondent, there was a brief filed by *Sarah L. Burgundy*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Sarah L. Burgundy*.

**2019 WI 97**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2017AP1104-CR
(L.C. No. 2015CF1281)

STATE OF WISCONSIN       :      IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

  **v.**

**Roy S. Anderson,**

      **Defendant-Appellant-Petitioner.**

**FILED**

**NOV 15, 2019**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANN WALSH BRADLEY, J. The petitioner, Roy S. Anderson ("Anderson"), seeks review of an unpublished, per curiam decision of the court of appeals affirming both his judgment of conviction and the denial of his motion to suppress evidence.[1] He asserts that the court of appeals erred in

---

[1] State v. Anderson, No. 2017AP1104-CR, unpublished slip op. (Wis. Ct. App. Sept. 12, 2018) (per curiam) (affirming the judgment of the circuit court for Racine County, Michael J. Piontek, Judge).

determining that law enforcement's search of his person pursuant to 2013 Wisconsin Act 79 ("Act 79") was valid.

¶2   Act 79 allows law enforcement to search a person on a specified probation, parole, or extended supervision status[2] without consent or a warrant if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime.   Generally, a full search cannot be accomplished absent probable cause.[3]   However, if a person is subject to Act 79, a full search may be conducted on the lesser showing of reasonable suspicion.

¶3   Anderson specifically contends that the arresting officer who searched him did not know that he was on supervision.   Absent such knowledge, the officer could not have

---

[2] See Wis. Stat. §§ 302.043(4) (2015-16) (released inmates serving risk reduction sentences), 302.045(3m)(e) (inmates participating in the challenge incarceration program), 302.05(3)(c)4. (those participating in the substance abuse program), 302.11(6m) (inmates on mandatory release to parole), 302.113(7r) (those released to extended supervision for felony offenses not serving life sentences), 302.114(8g) (felony offenders serving life sentences released to extended supervision after a successful petition for release), 304.02(2m) (inmates subject to special action parole release), 304.06(1r) (those granted parole from state prisons and houses of correction), 973.09(1d) (offenders placed on probation).

All references to the Wisconsin statutes are to the 2015-16 version unless otherwise indicated.

[3] State v. Marquardt, 2005 WI 157, ¶37, 286 Wis. 2d 204, 705 N.W.2d 878.

appreciated that Anderson was subject to search based on Act 79's reduced protections before conducting a warrantless search.[4]

¶4 He argues next that even if the officer had knowledge of his supervision status, the search was still illegal. Anderson contends that under the totality of the circumstances, the arresting officer lacked reasonable suspicion that Anderson was committing, was about to commit, or had committed a crime. As part of this argument, he asserts that tips received from an unnamed informant lacked any indicia of reliability and should be discarded completely from our analysis of the totality of the circumstances.

¶5 We conclude that the circuit court's finding of fact that the officer in this case had knowledge of Anderson's supervision status prior to conducting the warrantless search at issue is not clearly erroneous. Next, we determine that the corroborated tips of the unnamed informant in this case may be considered in our analysis of the totality of the circumstances, giving them such weight as they are due. Finally, we conclude that under the totality of the circumstances, the officer in this case had reasonable suspicion that Anderson was committing, was about to commit, or had committed a crime.

---

[4] In Anderson's brief before this court, he presents the first issue for our review as: "Did the arresting officer know that Mr. Anderson was subject to the reduced search provisions of Act 79 at the time he conducted a warrantless search of Mr. Anderson's person?"

¶6 Accordingly, we affirm the decision of the court of appeals.

I

¶7 On August 25, 2015, Officer Michael Seeger of the Racine police department was driving an unmarked police car in the City of Racine. He testified that within the two-and-a-half-week period prior, he had received "two separate tips from a reliable and credible informant about Mr. Anderson selling illegal narcotics" in an alley behind a particular address where Anderson was purported to have been living. No additional information regarding this unnamed informant is provided in the record.

¶8 Officer Seeger observed Anderson riding a bicycle on a sidewalk in violation of a city ordinance.[5] After seeing Anderson, Officer Seeger performed a U-turn and sought to make contact with him. Officer Seeger testified that "[u]pon Anderson seeing us, he immediately looked over his left shoulder and identified us. He also knows me from prior police contacts." After seeing and identifying Officer Seeger, Anderson made a right turn down a nearby alley, looked over his shoulder several times, and removed one of his hands from the bicycle's handlebars and placed it into his pocket, leading Officer Seeger to believe that "he was concealing an item within his pocket."

---

[5] See Racine, Wis., Mun. Code § 66-707 (2015).

4

¶9 Anderson's movements concerned Officer Seeger. The officer testified that "[b]ased on my training and experience . . . people involved in criminal activity will attempt to hide or destroy or conceal illegal narcotics when they have police interaction or being approached by police." He also observed that Anderson was located in a "high drug trafficking area within the City of Racine."

¶10 Officer Seeger pursued Anderson and ordered him to stop, and Anderson complied. Anderson subsequently stepped off of his bicycle and Officer Seeger performed a search of Anderson's person. In his testimony before the circuit court, Officer Seeger indicated that he performed this search pursuant to his authority under Act 79.

¶11 The search of Anderson turned up two individual bags of crack cocaine, over $200 in cash, and two cell phones. No drug paraphernalia was located on Anderson, indicating to Officer Seeger that Anderson was engaged in selling the crack cocaine.

¶12 This contact on August 25, 2015, was not Officer Seeger's first experience with Anderson. Specifically, the officer was familiar with Anderson because he had previously arrested Anderson for possession with intent to deliver cocaine in 2012. Officer Seeger further testified that even prior to that, Anderson's name had come to his attention "through other cooperative citizens in 2012."

5

¶13 Additionally, Officer Seeger testified that he knew Anderson had been released on "probation" on March 17, 2015.[6] His testimony further indicated that "[o]nce [Anderson] was released on probation, I ran him out. I did a record check of him and knew that he felony under Act 79 [sic]." However, Officer Seeger did not know how long Anderson's "probation" period extended.

¶14 As a result of Officer Seeger's search of Anderson, the State charged Anderson with possession of cocaine with intent to deliver as a second and subsequent offense.[7] Anderson moved to suppress the evidence obtained through the search, arguing that Officer Seeger lacked reasonable suspicion that he was committing, was about to commit, or had committed a crime. Accordingly, in Anderson's view, Officer Seeger lacked a legal basis to search him pursuant to Act 79.

¶15 The circuit court denied Anderson's motion to suppress. Initially, it found as a fact that Officer Seeger knew that Anderson was on supervision from the previous time he arrested Anderson for possession with intent to deliver.

---

[6] We observe that Officer Seeger used the word "probation" in his testimony to describe Anderson's supervision status. Although Anderson was on "extended supervision" and not "probation," this discrepancy does not affect our analysis. See G.G.D. v. State, 97 Wis. 2d 1, 3 n.2, 292 N.W.2d 853 (1980) (acknowledging that the terms "probation" and "supervision" are sometimes used interchangeably).

[7] See Wis. Stat. §§ 961.41(1m)(cm)1g., 961.48(1)(b).

6

¶16 Further, it concluded that Officer Seeger had the requisite reasonable suspicion to justify the search. It reached this determination based on its findings of the "properly proven facts" that Anderson rode his bicycle away from police, looked back at Officer Seeger, and placed his hand in his pocket. The circuit court also observed that "it's a high drug area in terms of drug sales and purchases" and that Officer Seeger "had prior information that the defendant was still involved in sales."

¶17 Anderson appealed and the court of appeals affirmed. The court of appeals concluded that "Seeger had sufficient basis to believe that Anderson was subject to Act 79." State v. Anderson, No. 2017AP1104-CR, unpublished slip op., ¶9 (Wis. Ct. App. Sept. 12, 2018) (per curiam). As support for this conclusion, the court of appeals observed facts indicating that "Seeger was familiar with Anderson, having arrested him before for possession of cocaine." Id. Further, Officer Seeger "knew that Anderson had been convicted of a felony and released on community supervision on March 17, 2015. Although Seeger did not know the length of Anderson's supervision, it was reasonable to presume that it lasted for a period beyond the date of the search . . . ." Id.

¶18 The court of appeals also determined that "Seeger had the requisite reasonable suspicion to trigger a lawful Act 79 search." Id., ¶10. In reaching this conclusion the court of appeals pointed to the following facts: (1) the tips Officer Seeger received from a confidential informant advising that

7

Anderson was selling drugs; (2) Anderson's history of possessing drugs; (3) Anderson's presence in a high drug trafficking area; and (4) Anderson's behavior, "which included turning down a nearby alley, repeatedly glancing backwards, and taking his left hand off the bicycle's handlebars and placing it into his front jacket pocket, as though he was attempting to conceal something." Id.

## II

¶19 This case requires us to review the court of appeals' determination that the circuit court correctly denied Anderson's motion to suppress. In reviewing a ruling on a motion to suppress, this court applies a two step standard of review. State v. Eason, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625.

¶20 First, we will uphold the circuit court's findings of fact unless they are clearly erroneous. Id. A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence. Metro. Assocs. v. City of Milwaukee, 2018 WI 4, ¶62, 379 Wis. 2d 141, 905 N.W.2d 784. Second, we review the application of constitutional principles to those facts independently of the decisions rendered by the circuit court and court of appeals. Eason, 245 Wis. 2d 206, ¶9.

## III

¶21 We begin by addressing the threshold inquiry of whether Officer Seeger had knowledge of Anderson's supervision status so as to justify an Act 79 search. Subsequently we address whether under the totality of the circumstances Officer Seeger had reasonable suspicion that Anderson was committing,

8

was about to commit, or had committed a crime. In our review of this second issue, we consider the extent to which the unnamed informant's tips factor into our analysis.

¶22 Act 79 created several statutes authorizing law enforcement officers to search individuals on certain community supervision statuses, including those on probation and parole, as well as those recently released from prison on extended supervision. As relevant here, Act 79 provides that a person released on extended supervision for a felony offense is subject to search under the following conditions:

> A person released under this section, his or her residence, and any property under his or her control may be searched by a law enforcement officer at any time during his or her period of supervision if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition of release to extended supervision. Any search conducted pursuant to this subsection shall be conducted in a reasonable manner and may not be arbitrary, capricious, or harassing. A law enforcement officer who conducts a search pursuant to this subsection shall, as soon as practicable after the search, notify the department.

Wis. Stat. § 302.113(7r).

¶23 In essence, this statute lowers the legal standard required for a law enforcement officer to perform a search of a suspect if that suspect is on one of Act 79's specified supervision statuses. Generally, a full search cannot be accomplished without a determination of probable cause. State v. Marquardt, 2005 WI 157, ¶37, 286 Wis. 2d 204, 705 N.W.2d 878.

9

¶24 On the other hand, an investigatory or Terry stop,[8] which typically involves only temporary questioning and a limited search[9] and constitutes but a minor infringement on personal liberty, can be utilized if law enforcement has reasonable suspicion that a crime has been committed, is being committed, or is about to be committed. State v. Young, 2006 WI 98, ¶20, 294 Wis. 2d 1, 717 N.W.2d 729. Thus, Act 79 allows for a full search of those subject to its provisions where reasonable suspicion is present, while a person not subject to Act 79 would be subject to only a Terry stop under the same circumstances.

---

[8] See Terry v. Ohio, 392 U.S. 1 (1968).

[9] Terry permits a limited "protective search" in certain circumstances.

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

State v. Limon, 2008 WI App 77, ¶27, 312 Wis. 2d 174, 751 N.W.2d 877 (quoting Terry, 392 U.S. at 30); see also Wis. Stat. § 968.25.

¶25 Anderson asserts that Officer Seeger lacked knowledge that he was on supervision so as to subject him to Act 79's provisions. Specifically, he contends that Officer Seeger's knowledge that he had been arrested in 2012 for possession with intent to deliver coupled with the knowledge gleaned from Officer Seeger's record check of Anderson that he had been released on "probation" on March 17, 2015, fails to support a conclusion that Anderson was subject to Act 79 on August 25, 2015, the date of the search.

¶26 We disagree with Anderson. The circuit court found as a fact that Officer Seeger "had personal information in that he had arrested the defendant in the past for possession with intent to deliver. He knew that [Anderson] was on parole or probation . . . or extended supervision from that arrest."

¶27 The circuit court's finding of fact in this regard is supported by the evidence presented at the hearing on Anderson's motion to suppress. First and foremost in our determination is Officer Seeger's testimony that he performed a record check of Anderson to determine his supervision status. The testimony reflects the following exchange:

> [THE COURT]: And when you say Act 79, were you aware was he on probation on August 25th, 2015?
>
> [OFFICER SEEGER]: Yeah. Once he was released on probation, I ran him out. I did a record check of him and knew that he felony under Act 79 [sic].
>
> [THE COURT]: Do you know what period his probation was, when it ended or anything like that? Or did you just know in August that he was on probation?

11

[OFFICER SEEGER]: No. I believe I put in my report the date he was released on supervision . . . .

I knew Mr. Anderson was released on probation on March 17, 2015 which is after the date that Act 79 went into effect.

[THE COURT]: Do you know how long his probation was?

[OFFICER SEEGER]: That I do not know.

¶28 This testimony strongly supports the circuit court's finding that Officer Seeger knew that Anderson was on supervision so as to subject him to Act 79. Although the grammar of Officer Seeger's testimony could be clearer, the thrust of the sentence, "I did a record check of him and knew that he felony under Act 79," is apparent——the officer conducted a record check and ascertained Anderson's supervision status from that check.

¶29 Officer Seeger further testified that he had on a prior occasion in 2012 arrested Anderson for possession with intent to deliver crack cocaine, which is a felony offense. See Wis. Stat. § 961.41(1m)(cm). This personal knowledge provides further information to bolster the determination made from the record check that Anderson had been convicted of a felony and was subject to Act 79.

¶30 Accordingly, we conclude that the circuit court's finding of fact that the officer in this case had knowledge of Anderson's supervision status prior to conducting the warrantless search at issue is not clearly erroneous.

IV

¶31 We turn next to the determination of whether under the totality of the circumstances Officer Seeger had reasonable suspicion that Anderson was committing, was about to commit, or had committed a crime.[10]

¶32 "The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Navarette v. California, 572 U.S. 393, 396 (2014) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). In determining whether reasonable suspicion exists to justify such a stop, we ask "whether the facts of the case would warrant a reasonable police officer, in light of his or her training and experience, to suspect that the individual has committed, was committing, or is about to commit a crime." State v. Post, 2007 WI 60, ¶13, 301 Wis. 2d 1, 733 N.W.2d 634.

¶33 Reasonable suspicion is a fairly low standard to meet. Eason, 245 Wis. 2d 206, ¶19. "Although it is not possible to state precisely what the term reasonable suspicion means, it is a 'commonsense nontechnical conception . . . that deal[s] with

---

[10] Although Anderson phrases his argument in terms of the constitutional standard for reasonable suspicion, we observe that the reasonable suspicion standard is also part and parcel of an analysis of whether Act 79 applies. To explain, Act 79 applies to allow a search of those on a specified supervision status "if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition" of supervision. Wis. Stat. § 302.113(7r) (emphasis added).

13

'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Id. (quoting Ornelas v. United States, 517 U.S. 690, 695 (1996)). "Such reasonable suspicion must be based on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" State v. Richardson, 156 Wis. 2d 128, 139, 456 N.W.2d 830 (1990) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)). A determination of reasonable suspicion is made based on the totality of the circumstances. Post, 301 Wis. 2d 1, ¶14.

¶34 The totality of the circumstances here consists of the following facts as found by the circuit court.[11] First, Officer Seeger received two tips from an unnamed informant indicating that Anderson was selling cocaine in the alleyway behind the specific address where he was found and purported to be living. Second, Officer Seeger had arrested Anderson in the past for possession with intent to deliver. Third, Anderson was located in a high drug trafficking area. Fourth and finally, Anderson's behavior consisted of riding his bicycle down an alley away from police, turning around to look at Officer Seeger, and removing one of his hands from the bicycle's handlebars and placing it in his pocket.

---

[11] Anderson does not contend that any of these factual findings are clearly erroneous. Instead, he asserts that the legal conclusion that the facts as found constitute reasonable suspicion of criminal activity is in error.

14

A

¶35 We consider initially the extent to which the unnamed informant's tips factor into our analysis. Anderson asserts that the unnamed informant's tips must not be included at all in the calculus of reasonable suspicion under the totality of the circumstances because "the record is devoid of any evidence as to the alleged informant's veracity or basis of knowledge." We have not squarely addressed such an argument in our prior cases.

¶36 Information gleaned from an informant's tip may justify police action in some circumstances. State v. Rutzinski, 2001 WI 22, ¶17, 241 Wis. 2d 729, 623 N.W.2d 516. Such tips vary greatly in reliability. Before police act on a tip, they must consider its reliability and content. Id. To justify police action, a tip should exhibit indicia of reliability, and due weight must be given to (1) the informant's veracity and (2) the informant's basis of knowledge. Id., ¶18 (citing Illinois v. Gates, 462 U.S. 213, 230 (1983)).

¶37 This court has recognized that different factors may inform a determination of an informant's veracity. See State v. Miller, 2012 WI 61, ¶31 n.18, 341 Wis. 2d 307, 815 N.W.2d 349. Accordingly, we have observed three categories into which informants generally fall: citizen informants, confidential informants, and anonymous informants. Id.

¶38 Citizen informants are generally considered among the most reliable. Id. (citing State v. Kolk, 2006 WI App 261, ¶12, 298 Wis. 2d 99, 726 N.W.2d 337). These are informants who

15

happen upon a crime or suspicious activity and report it to police. Id.

¶39 A confidential informant is often a person with a criminal past who assists police in identifying and catching criminals. Such an informant may be more reliable if he or she has provided truthful information in the past. Id.

¶40 Finally, an anonymous informant is one whose identity is unknown even to the police. This type of informant is considered reliable if police are able to corroborate details in the informant's tip. Id.

¶41 Here, the record provides very little information regarding the informant on whose information Officer Seeger relied. Officer Seeger testified that he "received two separate tips from a reliable and credible confidential informant about Mr. Anderson selling illegal narcotics. Both tips were received within a two and a half week period from the date of the incident." The record contains no other information indicating the informant's identity or whether the informant had provided reliable information to police in the past.

¶42 Officer Seeger's description of the tipster as a "reliable and credible confidential informant" indicates that the officer had some familiarity with the informant. However, the extent of any familiarity or previous assistance to police is not in the record. Additionally, the record is devoid of any information regarding the nature and extent of the informant's knowledge, whether direct or indirect. Without this information, the court cannot determine the tips' reliability.

16

Officer Seeger's bare assertion that the tipster was "reliable and credible" is not enough.

¶43 Therefore, the tips standing alone do not provide the requisite reasonable suspicion for Officer Seeger to conduct a search pursuant to Act 79. This does not mean, however, that we may not consider the tips at all in our analysis.

¶44 Indeed, the tips were corroborated by multiple facts in the record. The tipster provided an address where Anderson was alleged to be conducting drug sales in a back alley, and Anderson was found in the back alley behind that address—where he was purported to have been living and which was in an area known to be used for drug trafficking.

¶45 Further corroborating the tips was Anderson's behavior upon seeing Officer Seeger. Officer Seeger testified that "[u]pon Anderson seeing us, he immediately looked over his left shoulder and identified us. He also knows me from prior police contacts." When Anderson noticed Officer Seeger's presence, he turned down an alley, glanced back at the officer several times, and put his hand in his pocket, appearing to the officer that "he was concealing an item within his pocket." Such movements were significant to Officer Seeger because, in his words, "[b]ased on my training and experience, I know individuals involved in criminal activity such as possession of illegal narcotics will be overly curious about police's position and will also attempt to evade them as they attempt to approach."

¶46 Because the tips were corroborated, we do not discount them entirely in our analysis. See State v. Sherry, 2004 WI App

17

207, ¶19, 277 Wis. 2d 194, 690 N.W.2d 435 (explaining that police corroboration of an anonymous tip gives the tip recognized "indicia of reliability"). Our lack of knowledge about the tips' source is a question of the weight we give them in our analysis, not of whether we exclude them from our analysis completely.

¶47 Accordingly, we determine that the corroborated tips of the unnamed informant in this case may be considered in our analysis of the totality of the circumstances, giving them such weight as they are due.

B

¶48 Anderson argues next that the totality of the circumstances does not constitute reasonable suspicion of criminal activity. His argument is unpersuasive.

¶49 Again, the totality of the circumstances here consists of (1) the informant's tips that Anderson was selling drugs in the alleyway behind a particular address at which Anderson was purported to be living; (2) Officer Seeger's past arrest of Anderson; (3) Anderson's presence in the alleyway behind the address given by the informant, which was in a high drug trafficking area; and (4) Anderson's behavior, consisting of riding down an alley away from Officer Seeger, looking back at the officer several times, and placing his hand in his pocket. Although under the particular facts of this case none of these factors standing alone would support reasonable suspicion, when viewed in combination, Officer Seeger's suspicion that Anderson

18

had committed, was committing, or was about to commit a crime was reasonable.

¶50 When combined with the information known to Officer Seeger about Anderson's history, Anderson's behavior creates reasonable suspicion that criminal activity was afoot. Anderson's movements after he noticed Officer Seeger give rise to a reasonable inference that Anderson was trying to conceal something from the officer.

¶51 Further, Officer Seeger had information from the tips he received indicating that Anderson was selling drugs in the alley behind the address where he was observed. Officer Seeger knew that Anderson had engaged in selling drugs in the past, because he personally had arrested Anderson for just such an offense. Although insufficient to support reasonable suspicion on its own, consideration of this information in the totality of the circumstances is consistent with case law indicating that evidence of prior convictions or arrests can be taken into account in our analysis. See State v. Lange, 2009 WI 49, ¶33, 317 Wis. 2d 383, 766 N.W.2d 551 (citing 2 Wayne R. LaFave, Search and Seizure § 3.2(d), at 58-59 & nn.134-35 (4th ed. 2004) (collecting cases holding that "a suspect's prior convictions and prior arrests are not barred from consideration on the issue of probable cause")).

¶52 We acknowledge that none of Anderson's observed behaviors was illegal. However, in State v. Waldner, 206 Wis. 2d 51, 57, 556 N.W.2d 681 (1996), this court determined that "[t]he law allows a police officer to make an investigatory

19

stop based on observations of lawful conduct so long as the reasonable inferences drawn from the lawful conduct are that criminal activity is afoot."[12]  Even if officers observe no unlawful conduct, it may be "poor police work" to fail to investigate.  Id. at 61.  In this case, the totality of the circumstances gave Officer Seeger reasonable suspicion of criminal activity despite the fact that none of Anderson's observed behaviors alone was illegal.

---

[12] The Waldner court illustrated its point using the facts at issue in Terry v. Ohio, 392 U.S. 1, the United States Supreme Court's seminal case on investigatory stops.  State v. Waldner, 206 Wis. 2d 51, 59-60, 556 N.W.2d 681 (1996).  It observed:

> The Terry court upheld the legality of an investigative stop by a police officer who observed the defendants repeatedly walk back and forth in front of a store window at 2:30 in the afternoon, and then confer with each other.  The officer suspected the two of contemplating a robbery and stopped them to investigate further.

> Walking back and forth in front of a store on a public sidewalk is perfectly legal behavior.  Nonetheless, reasonable inferences of criminal activity can be drawn from such behavior.  As this court noted in Jackson, "the suspects in Terry 'might have been casing the store for a robbery, or they might have been window-shopping or impatiently waiting for a friend in the store.'"  Nonetheless, the Court concluded that the investigative stop of the Terry defendants was permissible because, based on the police officer's training and experience, their lawful conduct gave rise to a reasonable inference that criminal activity was afoot.  In short, Terry's conduct though lawful was suspicious.

Id. (quoting State v. Jackson, 147 Wis. 2d 824, 835, 434 N.W.2d 386 (1989)).

¶53 Anderson's reliance on State v. Gordon, 2014 WI App 44, 353 Wis. 2d 468, 846 N.W.2d 483, does not change the result. In Gordon, the arresting officer testified that he was on patrol in a high crime area where one of his duties was to "ferret out '[i]nstances where individuals are carrying guns illegally.'" Id., ¶¶3-4.

¶54 After Gordon recognized the officer's presence and reached his hand toward his front pants pocket in what the officer characterized as a "security adjustment,"[13] the officer stopped Gordon. Id., ¶9. Upon a frisk of Gordon, the officer located a concealed weapon and several individually packaged baggies of drugs. Id., ¶6.

¶55 The court of appeals determined that the arresting officer lacked reasonable suspicion to stop Gordon. Id., ¶18. It determined that although Gordon's security adjustment could, "given additional facts (such as, for example, flight or attempted flight), support an objective 'reasonable suspicion,' the additional facts here——high crime area and recognizing the police car as a police car——are far too common to support the requisite individualized suspicion here." Id., ¶17.

---

[13] A "security adjustment" is "basically a conscious or unconscious movement that an individual does when they're confronted by law enforcement when they're typically carrying . . . a weapon, and it's done either by the individual placing a hand over the pocket or a waistband where the gun might be, just to make sure that the weapon is still there and that it's secure." State v. Gordon, 2014 WI App 44, ¶9, 353 Wis. 2d 468, 846 N.W.2d 483.

21

¶56 Anderson contends that his reaching into his pocket is analogous to Gordon's security adjustment and is thus insufficient to establish reasonable suspicion in concert with the other factors present: high crime area and recognition of a police car. But the Gordon court was careful to observe that the result may have been different if other factors were present in the totality of the circumstances. Specifically, it wrote:

> Without more (such as, for example and not by way of limitation, the officers being aware that the person they wanted to stop was either wanted on a warrant or was known to have committed gun crimes), these findings, either taken separately or added together, do not equal the requisite objective "reasonable suspicion" that "criminal activity" by Gordon was "afoot."

Id., ¶14.

¶57 In this case, the "more" referenced by the Gordon court is present. Officer Seeger was aware that Anderson was known to have committed drug crimes——the officer had, after all, previously arrested Anderson for such a crime. Additionally, in this case we consider the tips Officer Seeger received indicating Anderson was selling drugs at a specific location, corroborated by Anderson's presence at that specific location and his behavior upon recognizing law enforcement. These factors that were not present in Gordon tip the balance.

¶58 We therefore conclude that under the totality of the circumstances, the officer in this case had reasonable suspicion that Anderson was committing, was about to commit, or had committed a crime.

22

V

¶59 In sum, we conclude that the circuit court's finding of fact that the officer in this case had knowledge of Anderson's supervision status prior to conducting the warrantless search at issue is not clearly erroneous. Next, we determine that the corroborated tips of the unnamed informant in this case may be considered in our analysis of the totality of the circumstances, giving them such weight as they are due. Finally, we conclude that under the totality of the circumstances, the officer in this case had reasonable suspicion that Anderson was committing, was about to commit, or had committed a crime.

¶60 Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶61 BRIAN HAGEDORN, J. *(concurring).* I join the majority opinion in full. It answers the questions presented consistent with the law.

¶62 I write separately, however, because both parties appeared to presume in their briefing that an officer's knowledge of a person's Act 79 status is a threshold question to the validity of any Act 79 search. We need not and do not answer that question today because Officer Seeger knew of Anderson's Act 79 status; the circuit court made factual findings to this effect, and the record supports those findings. But this issue may come up again, and a more careful analysis of how the Fourth Amendment interacts with the statutory requirements is essential to addressing this in a sound manner.

¶63 Wisconsin law has long granted broad authority to Department of Corrections employees to search offenders under the Department's custody and supervision. See Wis. Admin. Code § DOC 328.22(2) (Mar. 2017) (permitting searches when ordered by the court, with consent, and "[w]hen an employee has reasonable grounds to believe the offender possesses contraband or evidence of a rule violation"). Those under the Department's "supervision" include "offenders on probation, parole, extended supervision, or other statuses as authorized by court order or statute." See Wis. Admin. Code § DOC 328.03(10). Our cases have sanctioned this broad searching authority because those on supervision have uniquely diminished expectations of privacy under the Fourth Amendment. See, e.g., State v. Griffin, 131

1

Wis. 2d 41, 60-62, 388 N.W.2d 535 (1986) (holding warrantless search of probationer's residence by probation officer was permissible), aff'd by Griffin v. Wisconsin, 483 U.S. 868, 880 (1987) (affirming on narrower grounds).

¶64 In 2013 Wisconsin Act 79, the legislature extended this broad searching authority to law enforcement, raising new questions not previously addressed in our Fourth Amendment canon. Among them, to what extent do officers need to know a person has an Act 79 status? Whereas probation agents and other similar Department employees would almost assuredly know a person they wish to search is under the Department's supervision, the same assumption does not hold with law enforcement officers. The question for another day is what Act 79 and the Fourth Amendment have to say about this. While Wisconsin is not alone in granting such authority to law enforcement, this kind of policy is fairly new and uncommon, leaving us with little on-point legal authority with which to work, persuasive or otherwise. I write separately to sketch out some principles that should govern any future analysis.

¶65 In my view, adoption of a threshold officer-knowledge requirement as a precondition to the validity of an Act 79 search should be undertaken, if at all, only with a careful rooting in the relevant law—namely, the text of Act 79 and Fourth Amendment jurisprudence regarding those on extended supervision-like statuses.

¶66 Act 79 itself does not contain an officer-knowledge requirement. Instead, it simply empowers law enforcement to

2

search those with an Act 79 status. But the statute is not without protective boundaries. Rather than protecting those being searched by insisting on a certain level of officer knowledge regarding their status, Act 79 requires reasonable suspicion and mandates that all searches "be conducted in a reasonable manner and may not be arbitrary, capricious, or harassing." Wis. Stat. § 302.113(7r) (2017-18).

¶67 These statutory requirements implicitly suggest some level of advance knowledge by the searching officer. For example, an officer targeting a neighborhood troublemaker who the officer has no reason to think is subject to Act 79 would seem to be acting in an arbitrary, capricious, or harassing manner. Similarly, this language would likely preclude random searches of individuals in the hopes of catching someone with an Act 79 status (maybe the very definition of "arbitrary"). And any search of someone not subject to Act 79 would of course find no sanction in the text of Act 79. But the inquiry under the statute's language is focused on the reasonableness and nature of the search itself, and again, that language does not prescribe a separate officer-knowledge requirement to substantiate the validity of every search.

¶68 The follow-up question, then, is whether the Fourth Amendment requires more than the statute commands. Any answer would surely need to grapple with an important issue the parties did not sufficiently address: what level of Fourth Amendment protection do individuals on probation, parole, and extended supervision have?

3

¶69 At least two cases are particularly instructive. In 2006, the United States Supreme Court upheld a search conducted pursuant to a California statute authorizing suspicionless searches of parolees by law enforcement. Samson v. California, 547 U.S. 843, 846-47 (2006). The Court grounded its decision in the Fourth Amendment principle that parolees "have severely diminished expectations of privacy by virtue of their status alone." Id. at 852. It is worth noting that California's suspicionless search provision is far more intrusive than Act 79, which requires reasonable suspicion as a precondition to a law enforcement search. More recently, resting in part on Samson, this court upheld a condition of extended supervision that authorized a law enforcement search at any time for any reason. State v. Rowan, 2012 WI 60, ¶¶1, 4, 341 Wis. 2d 281, 814 N.W.2d 854. In reaching our conclusion, we adopted and applied Samson's expectations of privacy rationale to those on extended supervision: "As the Samson Court made clear, persons in Rowan's position have diminished privacy expectations, and the State has greater interests in supervising them to prevent criminal conduct, and those two facts make searches reasonable that would otherwise not be . . . ." Id., ¶14.

¶70 Because the text of Act 79 does not contain a threshold officer-knowledge requirement, any judicial imposition of that precondition must stem from the Fourth Amendment, and consequently, should be rooted in proper Fourth Amendment doctrine rather than analogies to general principles.

4

¶71 In short, Act 79 embraces a new policy that raises new questions——among them, whether and when the Fourth Amendment might demand more from law enforcement than Act 79 already requires. While today's decision leaves these issues for another day, such questions should be analyzed by close reference to the text of Act 79 itself and faithful application of Fourth Amendment principles to those with an Act 79 status.

¶72 I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this concurrence.