# COURT OF APPEALS
# DECISION
# DATED AND FILED

## July 22, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP463-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF599

**IN COURT OF APPEALS
DISTRICT IV**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

BENNIE L. JONES,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Rock County: MICHAEL A. HAAKENSON, Judge. *Affirmed*.

Before Blanchard, Kloppenburg, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Bennie L. Jones appeals a judgment of conviction for attempted first-degree intentional homicide and false imprisonment, both with the use of a dangerous weapon, and an order denying his postconviction motion. *See* WIS. STAT. §§ 940.01(1)(a) (2019-20)[1] (first-degree intentional homicide); 940.30 (false imprisonment).   Jones argues that the evidence is insufficient to support his conviction on the attempted homicide charge.   He also raises several challenges to his conviction on both charges that center on the undisputed fact that he had an untreated mental illness throughout proceedings in the circuit court.   We conclude that there is sufficient evidence to support Jones's conviction on the attempted homicide charge.   We further conclude that Jones's mental illness did not render his jury trial waiver unknowing, unintelligent, or involuntary and that the circuit court did not err in denying his requests for sentence modification or resentencing for reasons relating to his mental illness.   We affirm.

## BACKGROUND

¶2     Jones was charged with attempted first-degree intentional homicide and false imprisonment after he attacked his roommate D.D. with a hatchet and prevented him from leaving their apartment.[2]   Jones waived his right to a jury trial. The circuit court held a one-day bench trial in which Jones and D.D. gave conflicting accounts of their fight, and in which the court found D.D. to be a more credible witness.   The court found Jones guilty as charged.

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] Consistent with WIS. STAT. RULE 809.86, we use initials to protect the privacy and dignity interest of the victim.   We remind Jones's counsel that crime victims *must* be referred to by identifiers in all appellate briefs.

¶3 The circuit court sentenced Jones to twelve years' initial confinement and eight years' extended supervision on the attempted homicide count, to run concurrently to the lesser sentence imposed on the false imprisonment count. In determining this sentence, the court focused on the seriousness of the offense of attempted homicide, the character of the offender (in particular, Jones's "mindset … that if he is wronged, that he can do whatever he thinks is appropriate, that the laws don't apply to him"), and the resulting need to protect the public from the "high danger" Jones presented to the community.

¶4 Jones brought a postconviction motion for a new trial or, alternatively, sentence modification or resentencing. The thrust of Jones's motion was that, throughout the proceedings in the circuit court, he had a severe untreated schizoaffective disorder, of which the circuit court was largely unaware. In Jones's view, this circumstance either rendered his jury trial waiver invalid or warranted sentence modification (or resentencing) under various legal theories. The court held a hearing on the motion, at which it heard testimony from Jones, his trial counsel, his counsel at sentencing, and Dr. Jeffrey Marcus, a psychiatrist who examined Jones at the request of postconviction counsel. The court also considered psychiatric evaluations conducted by Dr. Marcus and treatment notes by Department of Corrections (DOC) staff. The court denied Jones's motion, and this appeal follows.

## DISCUSSION

¶5 Jones argues that the evidence is insufficient to support his conviction. He also contends that he is entitled to a new trial because his untreated mental illness rendered his jury trial waiver invalid. In the alternative, Jones seeks sentence modification or resentencing on related factual grounds. We address

3

these arguments in turn, with separate discussions of the law, standard of review, and facts applicable to each issue.

*Sufficient Evidence Supports the Conviction*

¶6    Jones argues that the evidence is insufficient to sustain his conviction on the attempted homicide charge.  It is the State's burden to "prov[e] each essential element of the crime charged beyond a reasonable doubt."  *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990).  We will not reverse a conviction on appeal "unless the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt."  *Id.*   In assessing the evidence, we adopt all reasonable inferences supporting the findings of fact, and we defer to the fact-finder's determinations of witness credibility and evidentiary weight.  *Id.* at 504.

¶7    We conclude that sufficient evidence supports the charge of attempted first-degree intentional homicide with a dangerous weapon.  To prove this charge, the State had to show that Jones attempted, with the use of a dangerous weapon, to "cause[] the death of another human being with intent to kill that person."  *See* WIS. STAT. §§ 940.01(1)(a); 939.32; 939.63(1)(b).  There are two elements to an attempted crime:  criminal intent and some acts in furtherance of that intent.  *State v. Webster*, 196 Wis. 2d 308, 320, 538 N.W.2d 810 (Ct. App. 1995).  "Intent to kill" means that the defendant "had the mental purpose to take the life of another human being or was aware that his [or her] conduct was practically certain to cause the death of another human being."  *Id.* at 321 (internal quotations and quoted source omitted).   "[I]ntent may be inferred from the

defendant's conduct, including his [or her] words and gestures taken in the context of the circumstances." *Id.* (internal quotations and quoted source omitted).

¶8      It is undisputed that Jones and D.D. were alone in their shared Beloit apartment, that they had a physical fight, and that Jones injured D.D.'s hand with a hatchet. Jones argues, however, that the evidence is insufficient to show that he intended to kill D.D. and that his actions were in furtherance of that intent. As explained below, we disagree.

¶9      D.D. and Jones both testified about their altercation. D.D. testified that he and Jones got into a physical fight early one morning, at about at 1:00 a.m. Jones was "very intoxicated" and swung at D.D. with a bat. Jones told D.D. to leave in the morning; D.D. agreed and went to his room. At about 6:45 a.m., Jones "came stomping" into D.D.'s room, either drunk or "high … on some type of narcotics," and started "swinging" at D.D. with a hatchet. D.D. grabbed a pole from his shoeshine box to block the hatchet blows; the "hatchet blade slid underneath" the pole and cut D.D.'s hand. Jones swung at him with the hatchet several times; if D.D. had not ducked or blocked the hatchet, it would have struck his chest or head. During the fight, Jones threatened to kill D.D. and said that he had "been waiting for this for a long time." Jones left the room, and D.D. made a tourniquet for his hand, which had "serious lacerations."

¶10      D.D. further testified that he tried to leave the house, but Jones "h[eld] the ax up … blocking [him] from leaving." D.D. tried to escape through the window; Jones moved toward him and "left an opening" in front of the door, allowing D.D. to leave through the door. D.D. drove toward the police station but, on the way, he spotted a police car parked on the street. D.D. stopped and told the officer what had happened. D.D. went to the police station, and then to the

hospital. Jones called D.D. as D.D. arrived at the hospital and again threatened to kill him. D.D. "sustained serious lacerations, nerve damage" in his hand that he was "still recovering from."

¶11 Jones testified that he was convalescing after foot surgery and unable to walk very well. Jones began arguing with D.D about money that D.D. owed him. D.D., and not Jones, was intoxicated during the argument. D.D. said that he would not pay Jones, so Jones destroyed marijuana plants that D.D. was growing in the basement. D.D. retaliated by hitting Jones on the foot with a pipe. D.D. went upstairs, and Jones became worried that D.D. was going to get a pistol that Jones believed D.D. owned. Jones grabbed a hatchet and went upstairs, where the two fought (Jones using the hatchet and D.D. using the pipe). Jones followed D.D. upstairs instead of leaving the house because he could not walk well and D.D. "runs like a deer"; Jones was worried that if he did not stop D.D. from getting the pistol, D.D. would harm him. Jones testified that he was acting in self-defense, although he admitted to purposefully hitting D.D.'s VCR with a hatchet because D.D.'s cocaine was on the VCR. Jones did not recall telling D.D. that he would kill him but, in any case, he did not intend to kill him. In fact, after Jones knocked the pipe out of D.D.'s hand, he could have killed D.D. but did not want to: "I just wanted him out of the house."

¶12 Three Beloit police officers gave testimony that largely corroborated D.D.'s version of events. One officer talked with D.D. at the police station. D.D.'s hand was bleeding, and D.D. said that his roommate Jones had attacked him. D.D. did not appear to be under the influence of alcohol or drugs. Another officer, who interviewed Jones, testified that Jones initially made untruthful statements, such as that he did not speak English and that he did not know D.D. During this interview, Jones said that he struck D.D. with the hatchet only after

6

D.D. had hit *him* several times in the arm with a metal pipe. The officer, however, did not see "bruising or anything like that … no signs that … Jones had actually been hit with this pipe." The officer also testified that "[t]here was no indication" that D.D. "was operating a drug grow operation in the residence."

¶13    In its oral decision at trial, the circuit court explained that "the main issue in this case" is "the credibility of the witnesses." The court found that there were minor inconsistencies in D.D.'s testimony, but found the testimony "pretty consistent within itself" and "also consistent with the physical evidence" in the house. The circuit court found Jones less credible than D.D. It noted that Jones initially lied to the police about some "pretty significant" things, such as whether he even knew D.D. The court also found there was no evidence of drugs in D.D.'s bedroom or in the basement, and no injuries on Jones from where, according to Jones, D.D. hit him with a pipe.

¶14    Based on these findings, the court credited D.D.'s version of events. Specifically, the court found that D.D. went to his room after a fight with Jones, that Jones came up to the room several hours later and began attacking D.D., that Jones stated that he wanted to kill D.D., and that Jones would have hit D.D. on the head with the hatchet had D.D. not blocked the blow with his shoeshine pole. The court determined that Jones's words and actions indicated his intent to kill: he swung three times at D.D.'s neck, shoulder, and head. The court stated, "I don't understand why anybody would be swinging in those areas without the intent to kill." Moreover, the court believed that these blows could have been fatal if D.D. had not ducked or blocked them. Thus, the court found that the State had met its burden of proving the elements of the offense: criminal intent and acts in furtherance of the intent. *See Webster*, 196 Wis. 2d at 320-21.

¶15    We conclude that the circuit court's findings are not clearly erroneous. It was within the court's sole purview to determine witness credibility. Because D.D.'s version reasonably showed Jones's intent to kill and his acts in furtherance of that intent, the court concluded that Jones met the elements of the crime of attempted first-degree intentional homicide. We have no basis to disturb that conclusion.

¶16    On appeal, Jones argues that he was acting in self-defense—a position the circuit court implicitly rejected and which we cannot, therefore, accept as true in light of the court's factual findings to the contrary. Jones further argues that the circuit court's finding of intent to kill was clearly erroneous because the record demonstrates that, "at more than one point in the altercation, Jones was in a position to kill [D.D.] with the hatchet, yet he did not." But even assuming that the record supports this characterization of the fight, the circuit court did not need to determine that Jones had a *continuous* intent to kill throughout the fight. Rather, the court simply needed to find intent and actions taken in furtherance of that intent. *See* WIS JI—CRIMINAL 1010 ("While the law requires that the defendant acted with intent to kill, it does not require that the intent exist for any particular length of time before the act is committed."). The circuit court determined that Jones had an intent to kill when he swung the hatchet at D.D.'s head. This finding is sufficient to establish this element of the crime.

¶17    Jones also argues that the court should have considered convicting him of a lesser-included offense. This argument is meritless: a fact-finder may consider a lesser-included offense only after it acquits on a greater charge. *See* **State v. Weirlein**, 136 Wis. 2d 445, 457, 401 N.W.2d 848 (Ct. App. 1987) ("The submission of a lesser-included offense instruction is proper only when the evidence reasonably supports both acquittal on the greater charge and conviction

on the lesser offense."). Here, the circuit court determined that Jones met the elements of the greater charge of attempted first-degree intentional homicide. At that point, and as a matter of law, the court could not have entertained a conviction on any lesser-included offense.

*Jones's Waiver of His Right to a Jury Trial Was*
*Knowing, Intelligent, and Voluntary*

¶18     The Sixth Amendment to the United States Constitution and article 1, section 7 of the Wisconsin Constitution guarantee a criminal defendant's right to a jury trial. A defendant may waive this right, but it is a constitutional requirement that the waiver be knowing, intelligent, and voluntary. ***State v. Anderson***, 2002 WI 7, ¶23, 249 Wis. 2d 586, 638 N.W.2d 301. As stated by our supreme court:

> To prove a valid jury trial waiver, the [trial] court must conduct a colloquy designed to ensure that the defendant: (1) made a deliberate choice, absent threats or promises, to proceed without a jury trial; (2) was aware of the nature of a jury trial, such that it consists of a panel of 12 people that must agree on all elements of the crime charged; (3) was aware of the nature of a court trial, such that the judge will make a decision on whether or not he or she is guilty of the crime charged; and (4) had enough time to discuss this decision with his or her attorney.

*Id.*, ¶24. The presumption is that a defendant did *not* waive his or her right to a jury trial; the state may overcome this presumption by proving, by clear and convincing evidence, that the waiver was in fact knowing, intelligent, and voluntary. *Id.*, ¶26. If the state cannot meet this burden, then the defendant is entitled to a new trial. *Id.*

¶19     On review, we accept the circuit court's factual findings unless they are clearly erroneous. ***State v. Miller***, 2012 WI 61, ¶26, 341 Wis. 2d 307, 815

9

N.W.2d 349. We determine de novo whether those facts demonstrate that the defendant knowingly, intelligently, and voluntarily waived his or her right to a jury trial. *Anderson*, 249 Wis. 2d 586, ¶12.

¶20 Jones argues that his waiver was not knowing, intelligent, and voluntary because the circuit court's colloquy did not establish the first prong of the test—that he was "ma[king] a deliberate choice, absent threats or promises, to proceed without a jury trial." *See id.*, ¶24. Specifically, Jones argues that the circuit court "failed to adduce whether [he] made a 'deliberate choice'" because

> the court did not inquire … whether he was currently suffering from a mental health condition, or whether he was currently being medicated for such a condition so as to ensure that his thinking was clear enough to allow him to knowingly, intelligently, and voluntarily waive his constitutional right to a jury trial. Neither did the court ask him if he had previously suffered from such a condition.

¶21 The factual basis for this claim is that Jones "has a longstanding thought disorder consistent with schizoaffective disorder," of which the circuit court was unaware when it accepted his jury trial waiver. According to the treatment records and the testimony of Dr. Marcus, Jones was then suffering from—but not receiving medication for—this disorder. Dr. Marcus testified that Jones's schizoaffective disorder is of the "depressed type," meaning that Jones has "a diagnosis of both schizophrenia and a depressive disorder" that has "lasted for many years." He testified that this disorder manifests on a spectrum (i.e., in various ways and to varying degrees), but "it is typically a disabling condition, it is chronic." A person with a schizoaffective disorder can have difficulty processing information and making informed decisions, and can be delusional and paranoid. Dr. Marcus acknowledged that he had no way of knowing what Jones's mental state was when he waived his right to a jury trial, because he examined Jones only

after he had begun medication. Dr. Marcus opined, however, that generally "someone with a schizoaffective disorder should [not] be making [that type of decision] while unmedicated" "unless they have great legal representation and the decision is made soundly."

¶22 Jones also testified. He stated that his current medications "calm[] [him] down from the delusions and voices." He further testified that he entered his waiver because trial counsel told him that he would have "a trial in front of [counsel's] friend, Judge Daley." Jones further testified that it was not until the sentencing hearing that he realized that the presiding judge was *not* Judge Daley.

¶23 Jones's trial counsel testified that he denied telling Jones that Judge Daley would preside at trial. He stated that, rather, Jones sought a bench trial because "Jones wanted to testify and he had 20 criminal convictions … and that was a major factor in the reason why we waived our right to [a] jury." Trial counsel testified that he "had no concerns" with Jones's competency to waive his jury trial right and that Jones did not express any delusions or hallucinations.

¶24 In an oral ruling, the circuit court reviewed the waiver colloquy transcript and determined, "There is no evidence indicating whatsoever that [Jones] didn't understand what was being shared with him." The court pointed out that, even at the postconviction hearing, "Jones [did not] indicate or testify under oath that he did not understand what happened during the colloquy." The court also found trial counsel credible, found that counsel did not tell Jones that Judge Daley would preside at trial, and deemed counsel's stated rationale for recommending a bench trial "a valid and reasonable strategic choice."

¶25 The circuit court further found that there was no evidence that Jones had some sort of delusion that might cause him to misinterpret or misunderstand

11

his discussions with trial counsel on this matter. The court found relevant Dr. Marcus's testimony that schizoaffective disorder "is a spectrum disorder [that] can vary among individuals." The court also relied on Dr. Marcus' acknowledgement that he could only speculate as to the status of Jones's mental health when Jones waived his right to a jury trial. In addition, Jones did not display to his attorney any signs of mental illness. In light of these considerations, the court found that Jones's mental illness was not on the "severe end of the spectrum" and was not "to the point where he was disabled [at the time of the waiver] in the sense that he didn't understand what was going on …. It is clear to me that … Jones was competent at the time that he waived his right to a jury trial."

¶26 We accept as true the factual findings underlying this decision: they rest on credibility determinations and reasonable inferences from the evidence, and thus are not clearly erroneous. The question is whether, given these facts, the State met its burden of showing that Jones's waiver was knowing, intelligent, and voluntary. We conclude that it has. Jones demonstrated that he had an untreated mental illness when he entered his waiver, but he did not present any evidence that this mental illness actually affected his ability to understand those proceedings, nor did he present evidence that he did not in fact understand the proceedings. Although Dr. Marcus opined that, generally, a person with untreated schizoaffective disorder should not be making major legal decisions, he qualified even that point by acknowledging that an appropriate, sound waiver could be made with "great" counsel. Further, Dr. Marcus necessarily could not opine on

12

Jones's specific mental state at the waiver hearing. Beyond all that, the evidence before the court was that Jones was lucid and rational at that time.[3]

¶27 On appeal, Jones points out that "courts routinely ask questions about mental health when a defendant" pleads guilty or waives his right to an attorney. In Jones's view, "[t]hat routine inquiry with respect to other fundamental constitutional rights should be required when a defendant waives his right to a trial by jury." As Jones himself concedes, however, there is no constitutional or statutory requirement that the circuit court conduct such an inquiry in this context. Moreover, even if Jones *had* demonstrated some defect in the waiver colloquy, this circumstance would have entitled him only to an evidentiary hearing—not withdrawal of his waiver. *See Anderson*, 249 Wis. 2d 586, ¶¶24-26 (adopting the framework of *State v. Bangert*, 131 Wis. 2d 246, 389 N.W.2d 12 (1986), to evaluate whether the waiver of the right to a jury trial was knowing, intelligent, and voluntary); *State v Howell*, 2007 WI 75, ¶¶27-29, 301 Wis. 2d 350, 734 N.W.2d 48 (if a *Bangert* motion makes a prima facie showing that the circuit court failed to fulfill its colloquy duties and that the defendant did not actually know or understand the information that should have been provided, the defendant is entitled to an evidentiary hearing, at which the state must demonstrate that the plea was knowing, intelligent, and voluntary). Here, Jones

---

[3] As part of his argument that the circuit court clearly erred in making its findings, Jones points to several statements in notes made by his treatment providers (recorded in the months following his April 2018 sentencing hearing) as purportedly demonstrating his inability to understand the September 2017 waiver proceedings. These notes, which Jones filed with his postconviction motion, state that Jones "continues to have fairly complex delusions and auditory hallucinations" and "has significant distortions of thinking, and perceptual disturbances." Absent additional detail or evidence, however, these notes do not necessarily bear on Jones's mental state in September 2017 or indicate that Jones's September 2017 waiver was unknowing or involuntary.

*did* receive a hearing—but he did not introduce any evidence at that hearing rebutting the combined import of the hearing testimony and waiver hearing transcript, which generally demonstrate that he was able to understand the waiver proceedings.

¶28    We agree with the State that, on this record, "Jones's claim that his waiver was unknowing or involuntary fails for lack of proof." Based on the circuit court's findings, which we have concluded are not clearly erroneous, it would be speculative to infer solely from the fact that Jones had an untreated mental illness that his waiver was not knowing, intelligent, and voluntary. Accordingly, we conclude that the circuit court did not err in denying Jones's request for a new trial.

*The Circuit Court Did Not Erroneously Exercise Its Discretion in Denying Sentence Modification on the Basis of a "New Factor"*

¶29    Jones argues that "the nature and extent of [his] mental illness, how that may have contributed to his conduct, and how that would factor into an appropriate sentence" constitutes a new factor warranting sentence modification. A "new factor" is

> a fact or set of facts highly relevant to the imposition of sentence, but not known to the trial judge at the time of original sentencing, either because it was not then in existence or because, even though it was then in existence, it was unknowingly overlooked by all of the parties.

*State v. Harbor*, 2011 WI 28, ¶¶40, 52, 333 Wis. 2d 53, 797 N.W.2d 828 (internal quotation marks and quoted source omitted).

¶30    A circuit court's decision on sentence modification involves a two-step inquiry. *Id.*, ¶36. First, the defendant must demonstrate the existence of a new factor by clear and convincing evidence. *Id.* Whether the facts or set of facts

put forth ultimately constitute a new factor, however, is a question of law. *Id.* Second, if the defendant establishes a new factor, then the circuit court must determine, in its discretion, whether that new factor justifies sentence modification. *Id.*, ¶37.

¶31 Our standard of review is likewise bifurcated: we determine de novo whether a new factor exists, but we review for an erroneous exercise of discretion the circuit court's ultimate decision on sentence modification. *Id.*, ¶33. We will sustain the court's discretionary ruling where it applied the proper legal standards to those facts of record or reasonably inferred from the record, so as to reach "a conclusion based on a logical rationale." *State v. Gallion*, 2004 WI 42, ¶19, 270 Wis. 2d 535, 678 N.W.2d 197 (internal quotation marks and quoted source omitted).

¶32 It is undisputed that the circuit court knew that Jones had a history of mental health issues. The presentence investigation report (PSI) states that Jones "reported he had been seen by a psychiatrist in 1994 … and in 2007," "reported he was diagnosed with paranoid schizophrenia," and "reported he takes the medications Thorazine and Cogentin." The PSI continues, "[a]ccording to WebMD, Thorazine is used to treat mental/mood disorders, such as schizophrenia[,] and Cogentin is used to treat side effects caused by other drugs." The PSI also states:

> The defendant self-reported he was diagnosed with paranoid schizophrenia. He was also placed in the Wisconsin Resource Center [WRC] due to depression as the defendant stated. It would be recommended that the defendant receive a mental health assessment to accurately identify any mental health needs and develop a treatment plan to address these needs.

15

At the sentencing hearing, the court referenced the fact that Jones was transferred to WRC because of depression and that Jones then "had hallucinations." The court also mentioned that Jones was seen by a psychiatrist in 1994 and 2007 and that Jones was diagnosed, and taking medication for, paranoid schizophrenia. The court further discussed that Jones "thought he was self-medicating [with alcohol and drugs] at the time of the incident" and that Jones "never really received any treatment, but he thought he could benefit from some treatment." In imposing its sentence, the court stated that Jones "clearly needs treatment" and "does have some mental health history" that had not been "fully addressed." It ordered that Jones get a mental health assessment and "follow any treatment deemed necessary."

¶33 Jones argues that, despite the circuit court's having this awareness of his mental illness, it did not have a full or meaningful insight into his condition. It is true that the evidence presented at the postconviction hearing paints a more complete picture on this point. For example, Jones's DOC treatment notes describe him as at times paranoid, delusional, and hallucinating, with "limited insight into his mental health illness." And at the postconviction hearing, Dr. Marcus described Jones as having "bizarre" and "fairly persistent" "chronic delusions of a paranoid nature, which means a persecutory or harmful type nature" that "were affecting pretty significant ideas of reality." Dr. Marcus testified that Jones, in an unmedicated state, might exhibit "impaired judgment, instability of mood, increased impulsivity, impaired behavioral inhibition and persistent psychosis." Dr. Marcus also testified to a reasonable degree of medical certainty, however, that Jones "did have an appreciation of the wrongfulness of his behavior at the time of the alleged incident" and "did have the ability to conform his behavior to the requirements of the law."

¶34     The circuit court found that Jones's mental illness was not a new factor, in that the court was "aware of … Jones'[s] mental health issues" at sentencing.  The court compared Jones to the defendant in *Harbor*, 333 Wis. 2d 53, ¶¶54-58, noting that, in each case, the circuit court was given a "more detailed" assessment of the defendant's mental illness in postconviction proceedings, but this information was not "significant in the sense that it's a new factor."  Furthermore, the court determined, even if the extent or presentation of Jones's mental illness could constitute a new factor, the court would not exercise its discretion to modify his sentence.  The court explained that Jones was convicted of a "violent" and "serious" offense that was part of a "pattern of physical violence and threatening behavior," as evidenced by his "long" criminal record.  The court noted that both the PSI "and [the court's own sentencing] analysis talked about how [Jones] had a belief that physical violence was appropriate" "and that it was acceptable to take justice into his own hands."  For those reasons, the court, at sentencing, "thought the need to protect the public was high because [Jones] thought he could resort to violence if things were not going well," making him "a high danger to the community."  Given these primary considerations—the seriousness of the offense, Jones's character, and the need to protect the public—the court found that "[m]ental health and rehabilitation were not the most important factors to the Court."  Therefore, "any change or additional information regarding his mental health history would not have changed the overall sentence."

¶35     In *Harbor*, 333 Wis. 2d 53, ¶57, our supreme court recognized that "any fact that was known to the court at the time of sentencing does not constitute a new factor."  Thus, where the defendant's "mental health issues were addressed, discussed, and considered during sentencing and … the court was cognizant of the

17

problem facing the defendant," then "as a matter of law … the facts related to [the defendant's] mental health do not constitute a new factor." *Id.*, ¶58 (internal quotations omitted). Jones argues, however, that, his mental health issues were not discussed in detail, as they were in *Harbor*, nor was his mental health discussed as a mitigating factor.

¶36 We will assume without deciding that additional relevant information about a defendant's mental illness might, under some circumstances, constitute a "new factor," even where the circuit court was aware of some aspect of the defendant's mental illness at sentencing. In this case, however, we cannot conclude that the circuit court erroneously exercised its discretion in not modifying Jones's sentence on this basis.

¶37 First, this is not a case in which the circuit court, at sentencing, lacked relevant information about Jones's history of mental illness. We have summarized above the multiple, concrete references to Jones's mental illness before the court, and the court took note of that history in sentencing Jones. The court, in its postconviction ruling, explained that it took into account Jones's mental health issues at sentencing, but that it "just didn't weigh [these issues] as heavily as … Jones would like me to." Instead, the court explained, it "found that there were other facts and factors that were more important." Thus, this is not a case in which the sentencing court was oblivious to the defendant's history of serious, persistent mental illness. The topic and some relevant facts were before the court, the court acknowledged them, and Jones fails to persuade us that the particular details he raised in the postconviction proceeding would have changed the court's basic understanding of his mental illness for purposes of sentencing.

¶38    Second, factors apart from mental illness predominated the sentencing court's reasoning, based on the court's reasonable weighing of relevant considerations.   Jones committed an indisputably serious and violent offense. Further, the PSI recounts a lengthy criminal history:   approximately 20 other convictions over almost forty years, some of which were for violent offenses.  The PSI also describes Jones as "quick to anger," "likely to rationalize his criminal behavior," and having "some antisocial attitudes," such as "refusing to accept responsibility" and "minimiz[ing] the seriousness and consequences of his criminal activity."  The PSI states that Jones "does not display any remorse for his actions in the current offense and portrays himself as the victim."  Moreover, in discussing his prior record, the PSI states that "it is evident that [Jones] believes himself to be more of a vigilante than a violator of the law."  The PSI recommends "a significant period of incarceration" "[c]onsidering [Jones's] justification for his actions and lack of remorse."  The sentencing court noted that Jones evinced these beliefs and attitudes by minimizing his role in the current offense and the extent of past offenses.  Thus, the record supports the court's conclusion that Jones's "belief that physical violence was appropriate" made him "a high danger to the community."  In such circumstances, the court reasonably focused on the need to protect the public and not on Jones's rehabilitative needs.

¶39    On appeal, Jones implies not just that the circuit court ignored his rehabilitative needs but that the new information regarding his history of mental illness "goes directly to [his] level of culpability" and "can distort [his] apparent lack of remorse, repentance, and cooperativeness."  At the postconviction hearing, however, Dr. Marcus testified that, whatever Jones's mental health symptoms may have been at the time of the offense, he understood right from wrong and could conform his behavior to the law.  Therefore, we cannot conclude that the circuit

court erroneously exercised its discretion in not considering Jones's mental illness a mitigating factor. We conclude that the record supports the circuit court's discretionary determination not to modify Jones's sentence on the basis of additional information about his mental illness.

*The Circuit Court Did Not Err in Not Ordering Resentencing*
*on the Basis of Ineffective Assistance of Sentencing Counsel*

¶40     We construe Jones to argue, in the alternative, that he is entitled to resentencing because sentencing counsel, in not fully investigating and presenting information regarding his mental illness, rendered ineffective assistance. *See State v. Smith*, 207 Wis. 2d 258, 273, 281-82, 558 N.W.2d 379 (1997) (ineffective assistance of sentencing counsel is grounds for resentencing). To establish ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance was prejudicial, meaning "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). We do not need to address both prongs of the *Strickland* test where the defendant makes an insufficient showing on one. *Id.* at 697.

¶41     Here we need not determine whether trial counsel's performance was deficient because Jones has not shown that he was prejudiced by counsel's failure to present additional evidence regarding his mental illness at sentencing. The circuit court expressly considered whether the information presented in postconviction proceedings was relevant to its sentencing determination, and the court determined that it was not. The court stated that there was no reasonable probability that the outcome of sentencing would have been different, explaining that it had "focused on different things than his mental health, different things than

rehabilitation. I had serious concerns that were outside of … Jones's mental health issues." The sentencing hearing transcript supports this conclusion. As we discuss above, the court was primarily concerned with the seriousness of the offense, Jones's criminal history, and how his beliefs and personality traits made him a "high danger" to the community. Therefore, because any additional information regarding Jones's mental illness would not have affected the court's sentence, Jones has not shown that the court erred in rejecting his request for resentencing based on the alleged ineffective assistance of sentencing counsel.

*The Circuit Court Did Not Erroneously Exercise Its Discretion in Denying Sentence Modification on the Basis That the Sentence Was Unduly Harsh or Excessive*

¶42 Jones argues that the sentence of twelve years' initial confinement and eight years' extended supervision was excessive or unduly harsh in light of the information on his mental illness presented in postconviction proceedings. A sentence is excessive or unduly harsh, such that its imposition constitutes an erroneous act of sentencing discretion, "only where the sentence is so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." **State v. Grindemann**, 2002 WI App 106, ¶31, 255 Wis. 2d 632, 648 N.W.2d 507 (internal quotations and quoted sources omitted). A sentence "'well within the limits of the maximum sentence'" is "presumptively *not* unduly harsh or unconscionable." *Id.*, ¶¶31-32 (quoted source omitted). "We review a [circuit] court's conclusion that a sentence it imposed was *not* unduly harsh and unconscionable for an erroneous exercise of discretion." *Id.*, ¶30 (internal quotations marks and quoted sources omitted).

¶43    Jones's sentence is presumptively not unduly harsh or unconscionable because it is well below the maximum (forty-five years on the attempted homicide count alone).    *See* WIS. STAT. §§ 973.01(2)(b)(1); 939.63(1)(b).  Turning to the record, we find no obvious basis for the circuit court to reasonably conclude that the sentence was unduly harsh or excessive.  The postconviction court reiterated the concern it expressed at sentencing that "Jones thinks he can do whatever he thinks is appropriate and that the laws don't apply to him."  The court noted that, even at the postconviction hearing, Jones "seem[ed] to be engaging in … untruthful behavior," in that he lied on the stand about how many prior convictions he had.  The court stated that it had "no doubt whatsoever" that it "considered the appropriate factors, that I weighed them appropriately, and that I entered an appropriate sentence."

¶44    We conclude that the circuit court did not erroneously exercise its discretion in determining that the was sentence not unduly harsh or unconscionable, and in not modifying the sentence on that basis.  The court reiterated the reasonable grounds for its sentence—the severity of the offense, Jones's mentality that "the laws don't apply to him," and the need to protect the public.  The sentence was well below the maximum and below even what the State recommended.  There is no basis for disturbing that exercise of discretion merely because the court did not weigh Jones's mental illness "as heavily as … Jones would like [it] to."

## CONCLUSION

¶45    Sufficient evidence supports the conviction for attempted first-degree intentional homicide.  In addition, Jones has not shown that his jury trial

waiver was not knowing, intelligent, and voluntary; nor has he shown that he is entitled to sentence modification or resentencing. Accordingly, we affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.